**THERMALON INDUSTRIES, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–1078C.

United States Court of Federal Claims.

Nov. 6, 1995.

Dale C. Nathan, Eagan, Minnesota, for plaintiff.

Sean P. Murphy, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Washington, DC, for defendant.

*OPINION*

ANDEWELT, Judge.

I.

In this government contract action, plaintiff, Thermalon Industries, Ltd., seeks breach of contract damages in the amount of $298,792 in connection with its work under a research grant from the National Science Foundation (NSF). This action is before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) and 12(b)(4). Defendant contends that the grant in issue is properly characterized as an agreement intended to effectuate the sovereign obligations of the United States and that all such agreements necessarily fall outside the scope of this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a). For the reasons set forth below, the court concludes that the instant grant agreement satisfies the criteria for an express or implied contract with the United States and, thus, falls within the scope of this court's Tucker Act jurisdiction.

II.

In a July 15, 1986, "Program Solicitation for Small Business Innovation Research," NSF invited "science-based" and "high-technology" small business firms to submit research proposals for funding by NSF. The solicitation stated that NSF would "support high-quality research proposals on important scientific or engineering problems and opportunities that could lead to a significant public benefit if the research is successful" (emphasis omitted).[1] Plaintiff submitted a responsive project proposal covering research on "Lightweight, Non–Absorbent, Loose–Fill and Batting–Type Thermal Insulations for Cold Climate Clothing." On September 6, 1988, NSF awarded a grant to plaintiff pursuant to NSF's authority under the National Science Foundation Act of 1950, 42 U.S.C. § 1861 *et seq.*, which authorizes NSF to promote scientific activities by entering "contracts or other arrangements," 42 U.S.C. § 1870(c). NSF originally awarded plaintiff $135,323 but later amended that amount to a total of $205,205.

The original award states that the grant is subject to NSF's published "Grant General Conditions," as well as certain other terms and conditions specified in the award, which together describe the rights and obligations of both the grantee and NSF. Under these

---

1. The solicitation described NSF's objectives as follows:

    Objectives of the three-phased program, in addition to supporting high quality research, include stimulating technological innovation in the private sector, increasing the commercial application of NSF supported research results, and improving the return on investment from Federally funded research for its economic and social benefits to the nation.

    (Emphasis omitted.)

terms and conditions, "[t]he grantee has full responsibility for the conduct of the project" and "[b]y acceptance of [the] grant ... agrees to comply with the applicable Federal [regulations]." The grantee, *inter alia*, must obtain prior written approval from NSF for certain activities and expenditures, may extend the expiration date of the grant under certain circumstances, and is expected to publish or otherwise make publicly available the results of its work under the grant. NSF in turn acquires, in addition to publication of the grantee's research results, title to any equipment the grantee purchases with NSF grant funds and a royalty-free, irrevocable, world-wide license to use any intellectual property developed under the grant. Further, with respect to patents, NSF acquires title to a patent, rather than merely a license, *inter alia*, in the event the grantee fails to disclose within a reasonable time that the patented invention resulted from the grant. *See* 35 U.S.C. § 202(c)(1).

Paragraphs 11 and 12 of the "Grant General Conditions" cover the grantee's receipt of payment from NSF. Paragraph 11 states, in part:

a. The allowability of costs and cost allocation methods for work performed under this grant, up to the amount specified in the grant, shall be determined in accordance with the applicable Federal cost principles in effect on the effective date of the grant and the terms of the grant.

Paragraph 12 states, in part:

a. Unless otherwise specified in the grant, the grantee shall receive payments under this grant through cash advance by U.S. Treasury check drawn in amounts necessary to meet current needs.... The grantee will arrange with the NSF Division of Financial Management for payment on a regular cycle or as required.

### III.

Plaintiff commenced performance of the grant work and thereafter submitted invoices to NSF for payment. The NSF Office of Inspector General audited the invoices and concluded that a substantial amount of the claimed costs were not allowable. After plaintiff had suspended all work on the project pending the final result of the Inspector General's audit, NSF terminated the grant. Plaintiff sought review of the Inspector General's findings within NSF, but NSF officials ultimately issued decisions rejecting plaintiff's claims for additional payment. Thereafter, plaintiff filed the instant complaint seeking a total of $298,792, which consists of $49,255 to cover the balance due under the grant, $99,537 to cover plaintiff's termination settlement costs, and $150,000 for consequential damages covering plaintiff's loss of a third-party investment.

### IV.

■ The Tucker Act provides that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States, founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The general requirements for a binding contract with the United States are identical for both express and implied contracts. *Russell Corp. v. United States*, 210 Ct.Cl. 596, 608–09, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration passing between the parties. *Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982). In addition, the party must demonstrate that the government representative who entered or ratified the agreement had authority to bind the United States in contract. *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991).

■ The party initiating suit has the burden to demonstrate that this court possesses jurisdiction over its complaint. *See, e.g., Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). Based on the materials presented by the parties, the court concludes that plaintiff has demonstrated the presence of the required elements for a binding contract with the United States. Defendant does not contend that the government agents involved lacked contracting authority, and the material pre-

sented by the parties reveals a mutual intent to contract, including an offer, an acceptance, and consideration. As to the offer and acceptance, NSF solicited proposals from small business firms in the July 15, 1986, solicitation, plaintiff submitted an offer in response, and NSF in turn issued an award. The issuance of the award constitutes either an acceptance of plaintiff's offer or, in the alternative, a counteroffer which plaintiff accepted when it commenced work on the grant project.[2] Because plaintiff ultimately commenced work under the grant, there was an offer and acceptance under either alternative.

■ As to consideration, the terms of the offer and acceptance, which are contained in the solicitation, the "Grant General Conditions," and the other terms and conditions specified by NSF in the award, provide for the passage of consideration between the parties. As explained above, plaintiff would receive from NSF funding for its research and NSF in turn would receive from plaintiff, *inter alia*, publication of plaintiff's research results, title to any equipment plaintiff selected and then purchased with grant funds, and a royalty-free license to the intellectual property resulting from the research, including a license under a patent. This royalty-free license potentially had significant economic value because without a patent license, NSF would have been vulnerable to a damage suit under 28 U.S.C. § 1498 in the event NSF practiced the patented invention. Because significant consideration passed to the government, the grant agreement cannot be characterized as a governmental gift or mere gratuity. *Compare D.R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 597–98, 372 F.2d 505, 507, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967).

Moreover, the parties' mutual intent to enter a contract is demonstrated by each party's dependency on the other's compliance with the terms of the grant agreement. From NSF's perspective, the terms and conditions of the grant agreement would likely result in NSF paying for much of the grant work before plaintiff published its research results, identified the subject matter of the royalty-free license, and relinquished control over equipment it purchased with grant funds. Hence, unless NSF could force plaintiff to comply with the terms of the agreement, it could not be assured that it would receive the anticipated benefits of its investment. From plaintiff's perspective, the grant terms establish an objective standard for assessing the allowability of incurred costs, *i.e.*, "[t]he allowability of costs ... for work performed under this grant ... shall be determined in accordance with the applicable Federal cost principles in effect on the effective date of the grant and the terms of the grant." If plaintiff could not hold NSF to this standard and NSF could unilaterally modify or simply refuse to follow that standard, then plaintiff could not be assured that its investment of time and money on the approved research project would be reimbursed by the United States. Hence, given the terms and conditions of the grant agreement, it appears that the parties intended to provide a mechanism by which to assure each other's compliance with the grant terms. A binding contract is a highly efficient mechanism to assure such compliance because it makes an independent decision maker, a court, available to review disputes between the parties within the context of established legal precedent. Viewing the grant terms and conditions in their entirety, the court concludes that the parties intended to be bound contractually.[3]

**2.** Whether the award constitutes an offer or a counteroffer depends upon whether NSF added terms to the award that were not previously disclosed to plaintiff, a fact which the court cannot determine based on the materials before it. If NSF did not add any new terms, the award would constitute an acceptance of plaintiff's offer, but if NSF did add new terms, the award would constitute a counteroffer, which plaintiff would have accepted when it commenced performance under the grant. In this regard, defendant's contention that no contract exists because "[plaintiff] did not commit in binding terms to

... take any action whatsoever" only suggests that acceptance occurred through performance.

**3.** To support its contention that the parties did not intend to enter an enforceable contract, defendant points to a statement in the solicitation that any resulting grant "is not subject to the Federal Acquisition Regulations, except for Phase II where the Cost Principles cited in 48 C.F.R., Subpart 31.2 will apply." A determination, however, to have some but not all of the Federal Acquisition Regulations apply hardly indicates that the parties did not intend to be

## V.

In its motion to dismiss, defendant argues that even if the terms and conditions of the grant agreement satisfy the traditional requirements for a binding contract with the United States, the circumstances surrounding the grant do not involve the type of agreement that Congress intended to fall within the scope of this court's Tucker Act jurisdiction. Defendant contends that "to invoke the Tucker Act jurisdiction of this Court, a plaintiff's claim must involve the Government's proprietary procurement of goods and services" and that plaintiff's claim herein does not involve such a procurement contract but rather involves an agreement pertaining to sovereign obligations. But, as explained in Sections VI–IX, *infra,* defendant's contentions misread the applicable statutes and precedent and misunderstand basic concepts of contract law.

## VI.

■ Defendant seeks support for its contention that this court's Tucker Act jurisdiction is limited to contracts involving the government's proprietary procurement of goods and services in the following statement in *Kania v. United States,* 227 Ct.Cl. 458, 464, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981):

> The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.

But in that statement, the *Kania* court explains that when drafting the Tucker Act, Congress had in mind "principally" those situations that involve the sovereign "step[ping] off the throne and engag[ing] in" proprietary actions similar to those undertaken by ordinary citizens. The court does not state that Congress had in mind *only* such situations. To the contrary, in the portion of the opinion directly following the above quotation, the court acknowledges that the Tucker Act reaches beyond government agreements that involve transactions of the type in which private parties engage among themselves so as also to include agreements that involve the exercise of traditional sovereign authority. *Id.* at 464–66, 650 F.2d at 268–69.

*Kania* involves an agreement in which the plaintiff, Eugene Kania, agreed to testify before a grand jury in exchange for a promise by the Assistant United States Attorney (AUSA) that Kania would not be prosecuted for certain of his prior actions. Kania carried out his part of the agreement and testified, but the government nevertheless prosecuted him for the very actions for which the AUSA had agreed there would be no prosecution. Kania thereafter sued the United States in the Court of Claims for breach of contract. In dismissing the action, the court agreed with Kania that the United States can enter into a contract enforceable under the Tucker Act covering the government's determination, as a sovereign, whether to seek an indictment for criminal conduct. After discussing a series of decisions that constitute binding precedent as to the scope of this court's Tucker Act contract jurisdiction, the court explained:

> By the same line of reasoning, we would deem it possible to make a binding contract subject to Tucker Act jurisdiction, creating a liability for breach of a plea bargaining agreement or one to grant immunity for giving testimony, or to protect a witness. But, in such case, the court would look for specific authority in the AUSA to make an agreement obligating the United States to pay money, and spell-

---

bound in contract by those representations that were specifically included in the grant arrangement. Rather, as discussed *infra,* the decision not to include certain of these regulations merely

suggests that NSF did not view the grant agreement as involving a typical "procurement contract."

ing out how in such a case the liability of the United States is to be determined.

*Id.* at 465, 650 F.2d at 268.

Hence, rather than concluding that the Tucker Act applies only to situations that involve the government "step[ping] off the throne and engag[ing] in [the] purchase and sale of goods" in the market place, the *Kania* court interpreted the Tucker Act as potentially reaching agreements with the United States relating to the carrying out of traditional sovereign duties such as the entering of plea agreements. The deficiency in Kania's claim was not that the plea agreement involved a sovereign act and thus fell outside of this court's Tucker Act jurisdiction. Rather, the deficiency in Kania's claim was a failure to establish one of the standard prerequisites for a contract enforceable against the government—the existence of contracting authority by the government agent who entered the agreement. *Id.* (plaintiff made "no attempt to show the AUSA had . . . authority" to bind the United States in contract). *Kania* therefore stands for a proposition antithetical to that for which defendant cites it. The *Kania* court recognized that the Tucker Act encompasses contracts involving the government's exercise of traditional sovereign powers and is not limited to contracts for the procurement of goods and services.

## VII.

■ Next, as alternative support for its contention that this court's Tucker Act jurisdiction covers only contracts involving the government's proprietary procurement of goods and services, defendant relies upon the Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. § 6301 *et seq.* (the Grant Act). The Grant Act distinguishes between three types of legal instruments (procurement contracts, grant agreements, and cooperative agreements) and defines the circumstances under which federal agencies must employ each type of legal instrument. For example, Section 6303 discusses the use of procurement contracts and provides:

An executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a . . . recipient when—

(1) the principal purpose of the instrument is to acquire . . . property or services for the direct benefit or use of the United States Government; or

(2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

Section 6304 discusses use of grant agreements and provides:

An executive agency shall use a grant agreement as the legal instrument reflecting a relationship between the United States Government and a . . . recipient when—

(1) the principal purpose of the relationship is to transfer a thing of value to the . . . recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring . . . property or services for the direct benefit or use of the United States Government; and

(2) substantial involvement is not expected between the executive agency and the . . . recipient when carrying out the activity contemplated in the agreement.

These and the other provisions of the Grant Act do not aid defendant because they do not address even obliquely the scope of this court's Tucker Act contract jurisdiction. There is no suggestion in the Grant Act that procurement contracts are the only type of contracts enforceable under the Tucker Act or that grant agreements that satisfy all of the ordinary requirements for a government contract should not be classified as contracts enforceable under the Tucker Act. In this regard, Congress' use of the word "contract" when referring to procurement contracts and of the word "agreement" when referring to grant agreements does not suggest that all grant agreements are not contracts. To the contrary, as explained in the Restatement (Second) of Contracts § 3 cmt. a (1979), "[a]greement has in some respects a wider meaning than contract, bargain or promise. . . . The word 'agreement' contains no implication that legal consequences are or are not produced." In other words, "agree-

ment" is broader in scope than "contract" in that agreements encompass both contracts, *see, e.g., County of Suffolk, N.Y. v. United States,* 19 Cl.Ct. 295, 297 (1990) ("[g]iven the existence of an offer, acceptance, and consideration, the two grant agreements ... constitute enforceable contracts"), and arrangements that do not qualify as contracts, *see, e.g., D.R. Smalley,* 178 Ct.Cl. at 598, 372 F.2d at 507 (holding certain federal grants of highway funds to be "gifts or gratuities"). Therefore, Congress' use of the term "agreement" in the Grant Act to describe a grant relationship cannot reasonably be interpreted as an indication that Congress intended for all grant agreements not to constitute contracts and to fall outside the scope of this court's Tucker Act jurisdiction.

Indeed, instead of supporting the conclusion that Congress intended the Grant Act to narrow this court's Tucker Act contract jurisdiction, the legislative history of the Grant Act demonstrates that Congress intended the definitions and mandates therein to address a very different set of concerns. The Grant Act was enacted in response to issues raised in a report by the Commission on Government Procurement (the Commission). *See* S.Rep. No. 449, 95th Cong., 2d Sess. 3 (1978), *reprinted in* 1978 U.S.C.C.A.N. 11, 13. The Commission had uncovered "confusions, inconsistencies, and inefficiencies" in executive agencies' selection of legal instruments when entering procurement contracts, grants, and cooperative agreements. *Id.* at 7, 1978 U.S.C.C.A.N. at 16. The Commission concluded that each of these relationships is distinct and that executive agencies should not employ identical procedures and provisions for each type of relationship. The Commission complained of a lack of uniformity among the various executive agencies in the treatment of these distinct relationships and in addition that some executive agencies had intentionally misclassified certain relationships so as to avoid having to include the appropriate provisions in the arrangements. The Senate Report on the Grant Act states:

No uniform statutory guideline exists to express the sense of Congress on when executive agencies should use either grants, cooperative agreements or procurement contracts. Failure to distinguish between procurement and assistance relationships has led to both the inappropriate use of grants to avoid the requirements of the procurement system, and to unnecessary red tape and administrative requirements in grants.

\*　　\*　　\*　　\*　　\*　　\*

As stated in the [Commission's] report, ... Federal grant-type activities are a vast and complex collection of assistance programs, functioning with little central guidance in a variety of ways that are often inconsistent even for similar programs or projects. This situation gives rise to inappropriate practices by Federal agencies, including the use of grants to avoid competition and certain requirements that apply to procurement contracts.

*Id.*

Hence, Congress enacted the Grant Act, in pertinent part, to assure that executive agencies both employ appropriate procedures in negotiating agreements and include appropriate provisions in the agreements negotiated. Congress recognized that certain provisions and procedures used in traditional procurement agreements, such as those involving requirements for competitive bidding, are not appropriate for grant arrangements, and vice versa. Congress, however, did not purport in the Grant Act to address the distinct issue of whether an arrangement that is not classified as a procurement contract can fall within the scope of the Tucker Act.[4]

As to the instant grant arrangement, because it appears that "the principal purpose of the relationship is to transfer a thing of value to the ... recipient to carry out a public purpose ... and ... substantial involvement is not expected between the executive agency and the ... recipient when carrying out the activity contemplated in the agreement," the arrangement appears to fit

---

4. To the extent that this interpretation of the Grant Act is inconsistent with the analysis in *Trauma Service Group, Ltd. v. United States,* 33 Fed.Cl. 426, 429 (1995), this court respectfully disagrees with that analysis.

within the statutory definition of a grant agreement rather than a procurement contract. NSF apparently so concluded because it exempted the agreement from most of the Federal Acquisition Regulations that apply to procurement contracts. As explained above, however, the classification of an arrangement with the United States as a grant agreement does not resolve the question of whether the arrangement constitutes a contract enforceable under the Tucker Act. The answer to that question is not found in the Grant Act but rather in the standards traditionally applied by this court requiring a mutual intent to contract, including an offer, acceptance, and consideration. For the reasons described above, application of those standards demand the conclusion that the instant grant agreement is a contract enforceable under the Tucker Act.

### VIII.

█ Next, defendant seeks support for its proposed interpretation of the scope of this court's Tucker Act jurisdiction in cases that invoke the sovereign acts doctrine. Defendant relies upon a statement in *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), that "[u]nder [the sovereign acts] doctrine, the government is not contractually liable for acts taken in its sovereign capacity for the public good." Defendant then argues that because NSF created the grant program in issue to promote the general public good, the sovereign acts doctrine dictates that defendant cannot be held liable under the Tucker Act for NSF's actions involving the grant. Again, however, as with *Kania,* defendant has selected out of context a few phrases from an opinion in an effort to support a rule of law which a reading of the entire opinion does not remotely support.

█ The sovereign acts doctrine, as explained in *Atlas,* does not touch upon the jurisdictional issue presented in defendant's motion to dismiss, *i.e.,* whether this court's Tucker Act jurisdiction excludes agreements that the United States enters to effectuate its sovereign obligations and is limited to agreements that involve the government's proprie-

tary procurement of goods and services. Rather, the sovereign acts doctrine involves the issue of whether a government action taken after the government has entered into a contract amounts to a breach of that contract. *Id.* The sovereign acts doctrine has evolved to address situations in which a governmental agency enters into a contract and then, through legislation or executive agency actions, interferes with performance of that contract. Under the doctrine, the government is not deemed to have breached the existing contract if the legislative or executive branch actions involve "public and general acts" rather than acts narrowly directed at abrogating specific contract rights. *Winstar Corp. v. United States,* 64 F.3d 1531, 1548 (Fed.Cir.1995) (noting that *Horowitz v. United States,* 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed 736 (1925), is "the leading case on the sovereign acts doctrine"). In *Horowitz,* the Supreme Court found no breach of contract when the government's "public and general act" of ordering a wartime embargo on certain railroad shipments had the effect of interfering with a contractor's receipt, pursuant to its contract with the government, of a shipment from a governmental agency. In *Shedd–Bartush Foods v. Commodity Credit Corp.,* 135 F.Supp. 78, 86 (N.D.Ill.1955), *aff'd,* 231 F.2d 555 (7th Cir.1956), the court found no breach of contract when the government's "public and general act" of terminating price ceilings applicable to a variety of materials had the effect of increasing the cost of performance under a government contract. In *Horowitz,* the Court summarized the sovereign acts doctrine as follows:

> It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.

267 U.S. at 461, 45 S.Ct. at 344. Because defendant's motion to dismiss raises the issue of whether a "particular contract" enforceable under the Tucker Act exists rather than whether the United States engaged in a "public and general act" that obstructed performance of the contract, the sovereign acts

doctrine and the cases that interpret it are inapposite.

## IX.

Finally, defendant relies upon statements in several Court of Federal Claims decisions that interpret *Kania* or *Horowitz,* or both, including *Kentucky Natural Resources and Envtl. Protection Cabinet v. United States,* 27 Fed.Cl. 173 (1992); *Town of North Bonneville, Wash. v. United States,* 5 Cl.Ct. 312 (1984); and *Aerolineas Argentinas v. United States,* 31 Fed.Cl. 25 (1994). For certain of these decisions, the portions upon which defendant relies are either taken out of context or constitute dicta. In any event, this court would not follow these decisions even if they supported defendant's proposed distinction because these decisions are not binding precedent and, as explained above, defendant's proposed distinction misreads *Kania* and *Horowitz.*

To support its interpretation of these decisions, defendant relies upon the following statement in *Horowitz:*

> The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.... In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.

267 U.S. at 461, 45 S.Ct. at 344 (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384–85, 1865 WL 1976 (1865)). In referring to the two distinct and infusible characters that the government possesses as a contractor, the Court was merely observing that the government initially had entered into a bilateral contract and thereafter engaged in certain distinct unilateral sovereign actions to promote the general public good. The Court did not suggest that the government entering into a contract is inherently distinct from the government acting as a sovereign or that the government cannot exercise its sovereign responsibilities and act for the public good by entering contracts enforceable under the Tucker Act.

In this regard, defendant cannot logically draw the line it proposes between proprietary governmental actions that involve the purchase and sale of goods and sovereign actions directed at achieving the public good. The purchase and sale of goods and sovereign actions taken for the public good are not mutually inconsistent categories. The United States is a sovereign and all of its actions constitute sovereign actions. Some government sovereign actions are narrowly focused and others are broadly aimed at the general public welfare. With either class of actions, however, the government has the option of exercising its sovereign authority either unilaterally or bilaterally, such as through a contract. Hence, for example, if the United States purchases vaccines for administration to the public in order to eradicate a particular disease, the government not only would be engaged in the purchase and sale of specific goods, but also would be concurrently exercising its sovereign power for the general public welfare.

■ In this setting, when applying this court's Tucker Act contract jurisdiction, the proper focus is not on the characterization of a government action as proprietary or sovereign, but rather on the means with which the government chose to carry out its sovereign function. If the government were to choose a bilateral arrangement that satisfies the traditional requirements for a contract, then that arrangement would fall within the scope of this court's Tucker Act jurisdiction. In this regard, the Tucker Act grants this court jurisdiction over express and implied government contracts and its wording places no limitation as to the subject matter that may be covered in those contracts.

The court must stress that its interpretation of the Tucker Act does not in any way infringe upon the United States' discretion in promoting the public welfare generally or in developing a system of financial grants in particular. As described above, contracts enforceable under the Tucker Act result only if there is a mutual intent to contract, including an offer, acceptance, and consideration. Therefore, the government always has the choice when designing a grant scheme to select a scheme that does or does not involve contracts. Moreover, the choice of a contract scheme ordinarily should limit an agency's exercise of discretion in only minor ways because the government can insist on whatever contract terms it chooses, including, for example, a restrictive definition of the standard for court review (*e.g.,* findings will be reviewed in court under an arbitrary and capricious standard) and even a limitation on the issues that may be contested in court. In addition, the choice of a contract scheme potentially brings important benefits to the government. A contract scheme not only enables the government to secure an independent forum in which to enforce the terms of an agreement, but also encourages participation in grant programs by ensuring that grantees may secure review by an independent decision maker in the event the government fails to fulfill its obligations under the agreement.

For the reasons set forth above, and based on the materials presented by the parties, the court concludes that NSF chose a contract format for the grant program and agreed, *inter alia,* that "[t]he allowability of costs and cost allocation methods for work performed under the grant ... shall be determined in accordance with applicable Federal cost principles." This court has jurisdiction under the Tucker Act to determine whether NSF complied with its obligations under the grant agreement.

*Conclusion*

For the reasons set forth above, defendant's motion to dismiss is denied. On or before November 20, 1995, defendant shall file its answer to plaintiff's complaint.

IT IS SO ORDERED.