Myrtle MOORE and Dicie
Charles, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 99–218C, 99–283C.

United States Court of Federal Claims.

Dec. 21, 2000.

J. Thomas Hardin, Inez, Kentucky, attorney of record for plaintiffs.

Russell A. Shultis, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant.

OPINION

ALLEGRA, Judge.

Myrtle Moore and Dicie Charles (plaintiffs) each filed complaints, later consolidated, alleging that the Army Corps of Engineers (the Corps) breached flood proofing agreements that it entered into with each of them. Plaintiffs claim that the monetary obligations established by these agreements were supplemented by oral statements made by an official of the Corps. Defendant has moved to dismiss these complaints, alleging lack of jurisdiction and failure to state a claim under RCFC 12(b)(1) and 12(b)(4), respectively. Based on the briefs filed, as well as the oral argument conducted in this case, this court finds that there is jurisdiction here, but that the complaints fail to state a claim upon which relief may be granted. Accordingly, the court **GRANTS** the government's motion to dismiss.

## I. FACTS [1]

These cases arose out of a program administered by the Corps to provide participants with the funds to flood proof their homes. Section 202 of the Energy and Water Development Appropriations Act of 1981, Pub.L. No. 96–367, 94 Stat. 1342 (1980), authorized the Huntington District Corps of Engineers to engage in this program. The Energy and Water Development Appropriations Act of 1994, Pub.L. No. 103–126, 107 Stat. 1312 (1993), appropriated funds and directed the Secretary of the Army to initiate the Martin County, Kentucky Non–Structural Project in accordance with the Corps' draft preliminary detailed project report. Structures in the project area were eligible for the program if their first finished floor was damaged by the 1977 Big Sandy flood event or would be damaged by a recurrence of a flood of that magnitude. Under this program, the United States would pay eligible participants the cost to flood proof their home if certain conditions were met.

---

1. "[I] n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court must presume that the factual allegations included in the complaint are true. *See Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

A homeowner who participated in the program was responsible for contracting with a private contractor to perform the flood proofing. Once the owner settled on a particular contractor, the Corps required the owner to execute a Flood Proofing Agreement ("Agreement") with the Government. The Agreement provided that the Government would pay program participants a sum established by the Government as the reasonable cost to flood proof the house. The homeowner agreed that he or she would bear any costs incurred beyond the amount in the Agreement and that the work would be performed by a licensed contractor. The owners were responsible for arranging the contractor's satisfactory completion of the work and acknowledged in the Agreement that the Government made no warranties regarding the contractor's ability to perform the work. In this regard, the Agreement emphasized that the Owner "will forever hold and save harmless and blameless the Government ... from any damages or injuries resulting either directly or indirectly from any flood proofing work...." Once the Agreement was executed, the homeowner formally engaged the private contractor to perform the work. The Corps did not execute any agreement with the contractor, but provided the homeowner with specifications for the contractor. Upon completion of the flood proofing, a final inspection was held by the homeowner, the Corps, and the contractor. The Agreement anticipated that the Government would then issue a check made jointly payable to the homeowner and the contractor.

Pursuant to this program, both plaintiffs engaged Scalf House Movers and Foundation Construction, Inc. ("Scalf") to flood proof their homes. Using the Agreement described above, the Corps agreed to pay Ms. Moore, $50,520, and Ms. Charles, $69,984.[2] Plaintiffs allege that John Rehme, a Corps employee, encouraged them to disburse funds to Scalf, even though that firm had failed to complete the work on their homes in accordance with the Agreement. Plaintiffs aver that Mr. Rehme knew that the work had not been properly performed, but, nonetheless, assured them that Scalf would complete the work satisfactorily if they released the funds they received from the Corps to Scalf. They assert that following the receipt of payment, Scalf never completed the work, leaving their houses allegedly in a state unfit for human habitation.[3] On May 11, 1999, Myrtle Moore filed suit against the United States in this court, seeking, inter alia, $50,520 to make necessary repairs to her home. On June 4, 1999, Dicie Charles filed a similar suit, seeking, inter alia, $69,984. By order dated October 6, 1999, the court consolidated these cases.

## II. DISCUSSION

The Court of Federal Claims is a court of limited jurisdiction. Under the Tucker Act, this court has jurisdiction to "render judgment upon any claim against the United

2. A copy of the Agreement was provided to the court and was treated as addendum to plaintiffs' respective complaints, consistent with RCFC 9(h)(3). As required by RCFC 12(b)(1) and 12(b)(4), the court has not considered any factual materials outside the pleadings.

3. Plaintiffs each brought suit against Scalf in the Martin Circuit Court in Kentucky. The state court conducted a separate trial in each case, following which it entered judgments on behalf of each of the plaintiffs. Ms. Moore was awarded a judgment against Scalf for $50,520 for breach of contract, $151,560 for fraud, $26,685 for gross negligence, $100,000 for punitive damages, and $15,000 for attorney's fees. Ms. Charles was awarded a judgment against Scalf for $69,984 for breach of contract, $209,952 for fraud, $24,500 for gross negligence, $50,000 for punitive damages, and costs. Mr. Rehme was not joined as a defendant in either case and did not testify at the trials. Notwithstanding, in its initial findings in the Moore case, the state court found that Mr. Rehme was an agent for both the Corps of Engineers and Scalf, and that he had committed fraud and had participated in a conspiracy with Scalf to defraud Ms. Moore. Following the entry of judgment, Mr. Rehme, in his individual capacity, entered an appearance, urging the court to set aside that portion of its findings concluding that he had committed fraud and participated in a conspiracy with Scalf. In response, the state court determined that, upon further review, there was no evidence in the record to supports its findings of fraud and conspiracy, observing that "[t]hough, there was testimony that Mr. Rehme may have made misleading statements or misrepresented certain facts to Mrs. Moore, there is no real evidence that any such alleged statements were made with any fraudulent intent."

States founded ... upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1) (1994); *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir.1998). In the instant case, plaintiffs argue that the flood proofing agreements constitute formal government contracts and that their breach claims are, therefore, within this court's jurisdiction.

 Defendant, for its part, asserts that the Agreements are not "contracts," and that, as a result, Tucker Act jurisdiction is wanting. It relies on *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981), for the proposition that the Tucker Act "does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." *Id.* at 268. Explaining this statement, the Court of Claims, in *Kania,* stated:

> The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.

*Id.* Cases following *Kania* have concluded that when the government is acting in its sovereign capacity, jurisdiction under the Tucker Act is limited to those situations in which the court finds "(1) specific authority ... to make an agreement obligating the United States to pay money and (2) specific language in the agreement 'spelling out how in such a case the liability of the United States is to be determined....'" *Drakes v.*

United States, 28 Fed.Cl. 190, 193 (1993) (quoting *Kania,* 650 F.2d at 268).

In cases applying this two-pronged approach, this court has readily held that it lacks jurisdiction to consider alleged breaches of plea bargain agreements, witness cooperation agreements and similar devices used in the criminal justice system. *See Sadeghi v. United States,* 46 Fed.Cl. 660, 662 (2000); *Doe v. United States,* 37 Fed.Cl. 74, 77–78 (1996); *Drakes,* 28 Fed.Cl. at 193–95; *Grundy v. United States,* 2 Cl.Ct. 596, 598–99 (1983).[4] But, in cases involving grants and cooperative agreements, this court has often reached a different conclusion, holding that jurisdiction exists to consider whether such agreements were breached. For example, in *Town of North Bonneville, Washington v. United States,* 5 Cl.Ct. 312, 320 (1984), *aff'd in part, rev'd in part on other grounds,* 833 F.2d 1024 (Fed.Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988), at issue was whether this court had jurisdiction to review alleged breaches of two agreements to relocate the town as part of a project to construct an additional power plant for the Bonneville Dam. Finding that the agreements involved the purchase of lands and goods "in a manner that is normal in contracts municipalities make with public utilities," this court concluded that the agreements were "included in the class of contracts subject to this court's jurisdiction under 28 U.S.C. § 1491(a)(1)." *Id.* In other cases involving a wide range of federal programs, this court and its predecessor have also concluded that jurisdiction lies under the Tucker Act to consider alleged breaches of grants or cooperative agreements.[5]

---

4. The court in these cases typically has reasoned that the government was acting quintessentially in its sovereign capacity, while also observing that the agreements in question did not contain any discussion as to how liability would be determined in the event of a breach. *See, e.g., Drakes,* 28 Fed.Cl. at 193–94. *See also Johnson v. Sawyer,* 980 F.2d 1490, 1501 (5th Cir.1992) ("the breach of a plea agreement never generates civil remedies such as monetary damages or specific performance").

5. *See Missouri Health and Med. Org., Inc. v. United States,* 226 Ct.Cl. 274, 641 F.2d 870, 873

(1981) (grant agreement under Public Health Service Act); *Texas v. United States,* 210 Ct.Cl. 522, 537 F.2d 466, 468–69 (1976) (Disaster Assistance Agreement under the Federal Disaster Act); *City of Wheeling, West Virginia v. United States,* 20 Cl.Ct. 659, 663–64 (1990) (grant agreement under the Federal Water Pollution Control Act); *Begay v. United States,* 16 Cl.Ct. 107, 131 (1987) (relocation agreement under the Navajo–Hopi Land Settlement Act). *Cf. Kentucky Natural Res. and Envtl. Prot. Cabinet v. United States,* 27 Fed. Cl. 173, 179–80 (1992) (jurisdiction lacking where no indication that parties intended memorandum of understanding to be binding).

More recently, in a watershed decision, the Federal Circuit redefined the standards to be employed in determining whether jurisdiction exists in cases such as this. In *Trauma Serv. Group v. United States*, 104 F.3d 1321 (Fed.Cir.1997), a provider of health care services entered into a memorandum of agreement (MOA) with an Army hospital under the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). The MOA provided for the sharing of resources between facilities for the uniformed services and those for a civilian health care provider. The provider claimed that the Army hospital had breached the MOA by forcing one of its x-ray technicians to work exclusively for non-CHAMPUS-related inpatients and argued that the Army, therefore, was obliged to reimburse it for the use of its x-ray technician. This court concluded, relying principally on *Kania, supra*, that it lacked jurisdiction to consider the alleged breach of the MOA because that agreement was not a "contract" within the meaning of the Tucker Act. *Trauma Serv. Group Ltd. v. United States*, 33 Fed.Cl. 426, 429–30 (1995). As further support for this conclusion, the court observed that "[t]he lack of any reference in the MOA to these statutes or regulations applicable to (and generally mandatory for) federal procurement contracts further establishes that the MOA was not intended to be a contract." [6] *Id.* at 429. Alternatively, the court held that provider's complaint failed to state a claim. *See id.* at 427.

On appeal, the Federal Circuit affirmed this court's dismissal for failure to state a claim, but disagreed with this court's ruling that jurisdiction was lacking. *Trauma Serv. Group v. United States*, 104 F.3d 1321 (Fed. Cir.1997). "To show jurisdiction in the Court of Federal Claims," the court indicated, the provider "must show that either an express or implied-in-fact contract underlies its claim." 104 F.3d at 1325. Regarding this requirement, the court held that a "well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction." *Id.* Shifting from this jurisdictional issue to the merits, the Federal Circuit stated that:

> any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration and a Government representative who had actual authority to bind the Government.

*Id.* at 1326. Based upon this analysis, the court stated that "contrary to the opinion of the trial court, a MOA can also be a contract," concluding, however, that "whether this one is, we do not decide." *Id.* Ultimately, the court concluded that no claim was stated because even if the MOA was a contract, it had not been breached. *See id.* at 1326–28.

■ Admittedly, *Trauma Service, supra*, is not easily reconciled with the earlier line of cases, described above, dealing with jurisdictional issues stemming from claims involving agreements under federal programs. Yet, *Trauma Service* clearly stands for the proposition that a plaintiff need only adequately plead the existence of a contract in order to properly invoke jurisdiction under the Tucker Act. This holding has been restated in at least one other Federal Circuit opinion involving a memorandum of understanding, *see Total Med. Mgmt. v. United States*, 104 F.3d 1314, 1320–21 (Fed.Cir. 1997), *cert. denied*, 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997),[7] and finds sup-

---

**6.** This court further based its jurisdictional ruling on a construction of the Federal Grant and Cooperative Agreement Act (the FGCAA), 31 U.S.C. §§ 6301–08 (1994), which governs agency use of "non-standard" agreements. The FGCAA draws a distinction between "procurement contracts" and "grant and cooperative agreements." It indicates that procurement contracts should be used when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," 31 U.S.C. § 6303, while grants and cooperative agreements should be used when "the principal purpose of

the relationship is to transfer a thing of value [i.e., money] to the State or local government or other recipient to carry out a public purpose...." 31 U.S.C. §§ 6304, 6305 (1994). This court in *Trauma Service* concluded that because the MOA was not a procurement contract under the FGCAA, it was also not a contract for purposes of the Tucker Act. 33 Fed.Cl. at 429–30. *But see* discussion *infra* note 7.

**7.** Reference to this proposition, with apparent approval, may also be found in another recent Federal Circuit decision involving an alleged cooperative agreement. *See City of Cincinnati v.*

port in a host of other recent decisions of the Federal Circuit and this court. *See, e.g., Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed.Cir.2000); *Gould, Inc. v. United States*, 67 F.3d 925, 929 (Fed.Cir.1995); *Buesing v. United States*, 42 Fed.Cl. 679, 687 (1999); *Thermalon Indus., Ltd. v. United States*, 34 Fed.Cl. 411, 416 (1995). Accordingly, the court believes that the jurisdictional analysis in *Trauma Service* is now well-established in the law. Under this analysis, it is beyond peradventure that each of the complaints here adequately allege that an express and, in the alternative, an implied-in-fact, contract, underlies the claims. Accordingly, this court find that Tucker Act jurisdiction exists to consider plaintiffs' breach claims.

▪ Of course, it is still relevant whether valid contracts arose here, creating claims cognizable under the Tucker Act—not as a jurisdictional issue, to be sure, but rather in determining whether the complaints state a claim. While *Trauma Services* hints, in *dicta*, at a possible resolution of this issue, it does not resolve whether this determination requires the court to apply only the traditional four-element test of a valid government contract (*i.e.*, offer, acceptance, consideration, and authority to contract) or, in the context of a grant or cooperative agreement, requires

something more be decided to bring the Agreements within the context of the Tucker Act.[8] This court, however, finds it unnecessary to resolve this thorny issue, for, like the Federal Circuit in *Trauma Service, supra*, it concludes that even if the Agreements constitute valid contracts, there was no breach here.[9]

In deciding whether dismissal for failure to state a claim is appropriate this court must focus on whether the complaints contain allegations, that, if proven, are sufficient to entitle the plaintiffs to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (A motion to dismiss for failure to state a claim should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief."). In the context of this case, this inquiry begins and essentially ends with an analysis of the terms of the Agreements.

▪ The interpretation of a contract is a legal question, appropriately resolved at this stage of the proceedings. *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1571 (Fed.Cir.1990) (contract interpretation is a question of law); *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.

---

United States, *153 F.3d 1375, 1377 (Fed.Cir. 1998)*.

8. For a discussion of this issue, see Jeffrey C. Walker, Note, *Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act*, 26 Pub. Cont. L.J. 683 (1997). Among other things, this article criticizes the notion, set forth in this court's decision in *Trauma Services, supra*, that the FGCAA is relevant in determining whether a cooperative agreement is "contractual" in nature. In this regard, the article posits that the fact that an agreement does not qualify as a "procurement contract" under that statute does not necessarily mean that it also does not qualify as "contract" within the broader language of the Tucker Act. *See id.* at 696, 700. *See also Thermalon Indus., Ltd.*, 34 Fed.Cl. at 418 ("Congress' use of the term 'agreement' in the [FGCAA] to describe a grant relationship cannot reasonably be interpreted as an indication that Congress intended for all grant agreements not to constitute contracts and to fall outside the scope of this court's Tucker Act jurisdiction").

9. Asserting that no valid contracts arose here, defendant argues that consideration was lacking

because no benefits flowed directly from the plaintiffs to the United States under the Agreements. The court, however, declines to rely on this argument as the basis for concluding that plaintiffs' complaints fail to state a claim because other forms of consideration clearly exist here. Thus, in exchange for the flood proofing, plaintiffs agreed to convey to a third party, the Martin County Fiscal Court, an easement to their property and agreed to not construct or alter structures on their land inconsistent with the flood plan. Contrary to defendant's claims, such concessions represent adequate consideration, as it is settled law that: (i) in a formal contract, consideration may take the form of detriment incurred by the promisee, rather than a benefit received by the promisor at the request of the promisor, *see Woll v. United States*, 45 Fed.Cl. 475, 477 (1999); *Restatement (Second) of Contracts* § 79 (1981), cmt. b, and (ii) that "[c]onsideration need not move from the person promising, but may move to a third person." *See John Deere Co. v. Broomfield*, 803 F.2d 408, 410 (8th Cir.1986); *Restatement (Second) of Contracts* § 71(4) (1981) ("The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.").

Cir.1987); *Southwest Welding & Mfg. Co. v. United States*, 179 Ct.Cl. 39, 373 F.2d 982, 985 (1967) (interpretation of contractual terms is ultimately a question of law). In construing a contract, the court is principally guided by the plain language of the agreement. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) ("Contract interpretation begins with the plain language of the agreement."); *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971) ("[T]he language of a contract must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances."). In this regard, the "court will attempt to read the contract's various provisions as a harmonious, integrated whole . . ., interpreting these provisions in their larger contractual context, rather than in isolation." *P.R. Burke Corp. v. United States*, 47 Fed.Cl. 340, 346 (2000) (citations omitted). *See also Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed.Cir. 1992), *cert. denied*, 506 U.S. 1048, 113 S.Ct. 965, 122 L.Ed.2d 121 (1993); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965).

■ Here, plaintiffs' claims for compensation immediately collide with the plain language of the Agreement. The government's only monetary obligation under the Agreement was to "pay reasonable and legitimate expenses involved in flood proofing" the plaintiffs' respective structures, said costs not to exceed a specified amount. And in both cases, the government paid the amounts specified. Contrary to plaintiffs' complaints, in the Agreement, the government did not warrant the contractor's work or otherwise agree to pay for any costs beyond those specified. To the contrary, the Agreement plainly states that "the Government has made no warranties or guarantees whatsoever in connection with the Contractor or with the Contractor's ability to satisfactorily perform the work." The Agreement further provides that "as between the Government and the Owners, the Owners are solely responsible to arrange for the Contractor's satisfactory completion of the work." Finally, in language undoubtedly drafted with poten-

tial claims of the sort at issue here in mind, the plaintiffs also expressly agreed that:

> The Owners, for themselves and their heirs and assigns, hereby covenant, warrant, and agree that they will forever hold and save harmless and blameless the Government and Martin County Fiscal Court, and its assigns, from any damages or injuries resulting either directly or indirectly from any floodproofing work and any flooding of said land or of the floodproofed structure.

Accordingly, the plain language of the Agreement could scarcely be any clearer in barring recovery from the United States based upon the flood proofing contractor's malfeasance or nonfeasance.

Retreating to their second line of defense, plaintiffs also contend that the government breached the Agreement when Mr. Rehme provided checks to plaintiffs and urged them to endorse those checks over to Scalf prior to the time that the work on their houses was completed. To be sure, the Agreement does anticipate that payment will not be made to the contractor until work is completed. In this regard, the Agreement requires the owner's written agreement with the contractor to contain the following provision: "The Contractor agrees that all floodproofing work will be accomplished in accordance with the Guide Plans and specifications previously provided by the U.S. Army Corps of Engineers before payment is made to the Contractor." The Agreement, however, clearly does not envision that if the government supplies a check before completion of the work and the owner chooses to endorse that check over to its contractor, the government assumes liability for any work not satisfactorily completed. To the contrary, as noted above, the Agreement instead provided that "as between the Government and the Owners, the Owners are **solely** responsible to arrange for the Contractor's satisfactory completion of the work in accordance herewith." (emphasis added). In light of this unambiguous language, embellished by the "hold and save harmless" clause quoted above, it is unreasonable to conclude that the clause in the Agreement anticipating full performance before payment was designed to

protect the owner of the property. Rather, viewing the Agreement as a whole, this provision instead appears designed to protect the government—not coincidentally, the drafter of the Agreement—by ensuring that the government's funds were being spent as intended. As such, even if the government could be viewed as having waived this payment provision, such a technical deviation from the Agreement would not lead to the recovery of the damages that plaintiffs claim.[10]

▮▮▮ Accordingly, under the Agreement, the government is not responsible for the damages that plaintiffs incurred when the work on their homes was left unfinished. Plaintiffs, however, contend that Mr. Rehme's representations gave rise to implied-in-fact contracts, expanding the scope of the original Agreement to include a governmental guarantee that the flood proofing work would be completed. An implied-in-fact contract must be "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances,

their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). *See also Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir. 1990). The Federal Circuit, however, has repeatedly instructed that "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Trauma Serv. Group*, 104 F.3d at 1326. *See also Atlas Corp.*, 895 F.2d at 754–55 (citing *ITT Fed. Support Servs. v. United States*, 209 Ct.Cl. 157, 531 F.2d 522, 528 n. 12 (1976)); *Northrop Grumman Corp. v. United States*, 47 Fed.Cl. 20, 41 (2000); *Reforestacion de Sarapiqui v. United States*, 26 Cl.Ct. 177, 190 (1992). In the instant case, the express contracts clearly cover the subject matter in question—indeed, they explicitly indicate that the government shall not be liable for the malfeasance or nonfeasance of the contractor performing the flood proofing work. Accordingly, plaintiffs' implied-in-fact contract theory must be rejected as a matter of law.[11]

10. *See* 13 Richard A. Lord, Williston on Contracts § 39.24 (4th ed.2000) ("it is well settled that a contracting party may unilaterally waive a provision of the contract … which has been placed in the contract for his or her benefit").

11. Likewise unavailing is plaintiffs' claim that Mr. Rehme's representations equitably estop the government from enforcing the Agreement. A party seeking to assert equitable estoppel against the government bears an extraordinarily high burden and must show "affirmative misconduct" in the form of a violation of the law. *Henry v. United States*, 870 F.2d 634, 637 (Fed.Cir.1989); *Hanson v. OPM*, 833 F.2d 1568, 1569 (Fed.Cir. 1987). Though the exact meaning of "affirmative misconduct" has never been resolved, one court held that even a false statement did not constitute affirmative misconduct because the plaintiff had not shown a "deliberate lie … or a pattern of false promises." *Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir.1986). In the instant case, plaintiffs do not allege any specific actions of affirmative misconduct, but simply assert that Mr. Rehme "misrepresented" the facts to them in assuring that the work would be completed on their houses. In these circumstances, equitable estoppel clearly does not apply.

 In seeking to bolster their equitable estoppel claim, plaintiffs argue that the findings of the Martin Circuit Court in the Moore and Charles

civil actions against Scalf should be binding against the government by virtue of collateral estoppel. Issue preclusion applies when an issue of fact or law is actually litigated and determined by a valid and final judgment and that determination is essential to the judgment. Then, the determination is deemed conclusive in a subsequent action between the parties. *See Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Several elements of collateral estoppel, however, are conspicuously lacking here. First, the issues in these cases are distinct from those in the state cases. In the state court, the issue was whether, under Kentucky law, Scalf had breached its contracts with Ms. Charles and Ms. Moore—the state court neither construed the Agreement here nor determined whether Mr. Rehme somehow orally modified those agreements. Second, the government was neither a party to the state actions nor in privity with someone who was a party therein. *See Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597–98, 68 S.Ct. 715, 92 L.Ed. 898 (1948). While plaintiffs argue that the United States and Scalf were in privity under *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, 1110 (6th Cir.1981), that case clearly is inapposite, because unlike the indemnitee and indemnitor in *Vulcan*, the United States and Scalf have no legal relationship under which they are accountable for one another. Instead, the Agreement provided

### III. CONCLUSION

The court is sympathetic with plaintiffs' apparent plight, but that does not supply a normative basis for recovery here. *See United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (noting that Court of Federal Claims generally lacks the power to grant remedies based on equities). As unfortunate as the results in these particular cases may be, our law often remains as Justice Oliver Wendell Holmes, Jr. described more than eighty years ago, *to wit,* individuals "must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920). For the reasons stated above, defendant's motion to dismiss must be **GRANTED**. The Clerk is ordered to dismiss the complaint, with prejudice. No costs.

that the government made no warranty regarding Scalf's work and that the plaintiffs must hold the government harmless for any damages arising from the work. *Cf. Lee v. United States,* 124 F.3d 1291, 1296 (Fed.Cir.1997) (holding that the government was not in privity with a provider of child care pursuant to an Army child care program and, thus, the government was not bound by judgment obtained against the provider absent a duty on behalf of the government to defend the provider). For similar reasons, plaintiffs' reliance on *NLRB v. Donna–Lee Sportswear Co.,* 836 F.2d 31, 35 (1st Cir.1987) is also misplaced. There the NLRB and a local union had closely identifiable interests and legal positions that they had both asserted in a prior administrative hearing. No similar facts exist here. Indeed, even if collateral estoppel applied, it would not benefit the plaintiffs, for none of the state court's findings support plaintiff's equitable estoppel claim or bear upon any of the critical questions before this court. Indeed, the state court notably amended its findings in the Moore case to make clear that Mr. Rehme had neither defrauded Ms. Moore nor participated in a conspiracy with Scalf toward that same end—findings that run directly counter to plaintiffs' equitable estoppel argument here.