**THERMALON INDUSTRIES, LTD., Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

**No. 94–1078C.**

United States Court of Federal Claims.

Jan. 16, 2002.

Dale C. Nathan, Eagan, MN, for plaintiff.

Lawrence N. Minch, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

MILLER, Judge.

This case is before the court on transfer after trial. Among the issues to be decided are whether the National Science Foundation can be bound by findings of a final audit of grant funds expended on a development project; whether the National Science Foundation is bound by the determination of its agency appeals board or whether the grantee must substantiate its cost claims *de novo* in court; whether the National Science Foundation itself can rely on the agency findings to defend against the grantee's claims; and whether the Government has the burden of proof to recoup monies advanced to the grantee.

### FACTS

Thermalon Industries, Ltd. ("plaintiff"), is a subchapter S corporation engaged in scientific research. Stephen D. Miller is plaintiff's owner, president, and sole employee. Mr. Miller's parents sit on plaintiff's Board of Directors and serve as its Vice President and Secretary, respectively. On March 16, 1987, the National Science Foundation (the "NSF") awarded plaintiff a grant for Small Business Innovation Research ("SBIR") ultimately totaling $205,205.00. The NSF provided the grant pursuant to its general authority under

the National Science Foundation Act of 1950, 42 U.S.C. § 1862 (1994 & Supp. V 1999), and the SBIR Program, 15 U.S.C. § 638 (2000), which authorize the NSF to promote scientific activities by entering into contracts or other arrangements with small businesses for purposes of technological innovation and commercial application of NSF supported research. Plaintiff's grant was dedicated to research into lightweight clothing insulation. The research was to be performed primarily by plaintiff, with assistance in theoretical and laboratory testing work from Battelle Memorial Institute and Kansas State University.

### 1. The terms of the grant

The NSF awards SBIR funds in three phases, each of which must be solicited independently by the researcher. In correspondence with plaintiff, the NSF explained that Phase I of the grant was subject to FL200 Grant General Conditions and that Phase II of the grant was subject to both GC–1 Grant General Conditions (the "General Conditions") and the NSF SBIR program solicitation.[1] In turn, these conditions incorporate by reference provisions of the NSF Grant Policy Manual (the "Grant Policy Manual"), Federal cost principles, and various Office of Management and Budget ("OMB") and Treasury Department circulars. Unlike Phase I, Phase II also was subject to the cost principles contained in 48 C.F.R. (FAR) subpt. 31.2 (1987): "Contracts with Commercial Organizations." In a letter dated September 27, 1989, awarding additional support, the NSF informed plaintiff that "[t]he amount granted includes an indirect cost allowance at the rate(s) specified in the approved budget. This is a maximum provisional rate(s) which is subject to downward adjustment only."

The General Conditions describe the rights and obligations of both plaintiff and the NSF as to the grant. Article 1 states, in part:

    c. By acceptance of this grant, the grantee agrees to comply with the applicable Federal requirements for grants and cooperative agreements and to the prudent

management of all expenditures and actions affecting the grant.

Article 11 explains that expenditures "for work performed under this grant ... shall be determined in accordance with the applicable Federal cost principles in effect on the effective date of the grant and the terms of the grant." As for monies received under the grant, article 12 stipulates that "[t]he grantee agrees to comply with all applicable Treasury regulations and National Science Foundation implementing and reporting procedures which are outlined in Chapter IV and Chapter VI of the *Grant Policy Manual*." The Grant Policy Manual, a compendium of basic NSF grant policies, establishes standards applicable to all aspects of grant management.

### 2. The audit

Plaintiff's Phase II grant was selected randomly for audit sometime in 1989, and the NSF informed plaintiff of the audit by letter dated December 11, 1989. The letter instructed plaintiff to make the following documents available for review:

1. a description of [its] accounting and internal control system;

2. a summary of costs claimed and incurred for each NSF award by expense category (salaries and wages, travel, materials and supplies, etc.) and by accounting year through the most current quarter that costs are recorded in accounting records and reported to the NSF;

3. documentation for funds received from the NSF;

4. documentation to support all costs claimed including time records, invoices, cancelled checks, travel claims, indirect cost proposals, etc.; ...

5. copies of the NSF awards and amendment(s) or modification(s); [and]

6. indirect cost proposal for the years ended 1987, 1988, and 1989.

The field audit was conducted during the week of July 9–13, 1990, by Ulysses S. Goodwin, then Senior Auditor, Office of the Inspector General, National Science Founda-

---

1. As this dispute arose before plaintiff completed Phase II, no Phase III grant was solicited or made.

tion, in the presence of Thomas Gerald Kinsella, plaintiff's accountant.

Mr. Goodwin first visited plaintiff's physical facility. Thereafter, he inspected the records provided by plaintiff at Mr. Kinsella's office. During the course of the audit, Mr. Goodwin expressed dissatisfaction with plaintiff's general ledger, because it only recorded data reflecting Mr. Miller's expenditures on the NSF grant, and dissatisfaction with the overall lack of supporting documentation for plaintiff's grant expenditures, which, he testified, made tracing the expenditures difficult. At Mr. Goodwin's request, Mr. Kinsella prepared a second general ledger, consolidating all of Mr. Miller's income and expenditures, which he believed conformed to the request.

On July 13, 1990, Mr. Goodwin held an exit conference with Messrs. Kinsella and Miller. He informed them of his concerns regarding plaintiff's finances, accounting methods, and overall compliance with the NSF grant terms and conditions. Mr. Goodwin also expressed concern about the accuracy of the audit, as he could not account for 100% of plaintiff's time and activities. Mr. Kinsella withdrew as plaintiff's accountant on the same day, stating in a letter of July 13, 1990: "In the preparation of the financial statements that were given to the auditor, I have discovered that not all information had been provided to us and this has caused these financial statements to not be valid and are useless to the auditor at this time."

By letter dated August 28, 1990, plaintiff informed the NSF of its concern about the audit and reported its eagerness to respond to Mr. Goodwin's perturbations. Having received neither a copy of the audit nor a response to its letter, plaintiff unilaterally suspended performance of the grant on September 30, 1990, and informed the NSF of this suspension by letter dated October 2, 1990.

The NSF provided plaintiff with a draft audit report on November 28, 1990. In the draft Mr. Goodwin questioned a total of $112,065.00 of the $146,791.00 in costs claimed by plaintiff. Challenged costs included:

1. Direct salaries and payroll taxes in the amount of $48,816.00 claimed as salary to Mr. Miller, because actual payments were not made to him, but instead were issued as promissory notes, and because the salaries were not reported as income and payroll expenses on personal and corporate income tax returns to federal and state authorities;

2. Facility-use charges of $20,340.00 and fringe benefit costs of $1,900.00, because they were not supported by invoices, canceled checks, or any other source documents showing incurred costs;

3. Travel costs for $337.00 because they were charged twice;

4. Subcontract costs in the amount of $46,384.00 for services provided by Mr. Miller, because no checks were issued for payment and because federal cost principles do not allow professional service costs to be charged for persons who are also officers or employees of the performing organization;

5. Indirect costs of $1,900.00, because they were charged on a direct allocation basis to the grant and were not supported by invoices, canceled checks, or any other source documents showing incurred costs.

Plaintiff responded by letter dated January 14, 1991. Plaintiff expressed a general opinion that its accounting system and practices were valid and acceptable, but stated that it would not contest the auditor's findings. However, for many of the draft recommendations, plaintiff indicated that its compliance would be predicated on the NSF's willingness to pay plaintiff's costs of implementation.

On March 25, 1991, the NSF issued the final report of its financial and compliance examination of plaintiff (the "Final Audit"), which adopted Mr. Goodwin's findings. The Final Audit concluded, *inter alia*, that plaintiff had failed "to comply with the Federal Acquisition Regulation (FAR), the NSF Grant Policy Manual (GPM), the Grant General Conditions (NSF GC–1), and other appropriate NSF and Federal compliance requirements." It noted a lack of invoices and other source documents to support grant

costs and an absence of time records to substantiate Mr. Miller's activities. As to the general ledger, the Final Audit deemed the financial data to be inconsistent, characterized without explanation, and "unreliable," charging that plaintiff "failed substantially to comply with even the most basic requirements for sound grant management." The Final Audit recommended that the NSF seek repayment of $125,591.00, representing the $112,065.00 in disallowed costs identified by Mr. Goodwin, $1,700.00 in interest earned on money market accounts funded with grant monies, and $11,826.00 in funds advanced but not expended at the time of the audit. It also recommended immediate termination of the grant, debarment of Mr. Miller and plaintiff from future grants if plaintiff did not promptly return all questioned costs, and referral of the matter to the Department of Justice for a potential fraud claim.[2]

### 3. The post-audit negotiations

In a May 28, 1991 letter to NSF Grants and Contracts Officer William C. Bruning, plaintiff expressed concern about the Final Audit's recommendation of debarment and its implications for plaintiff's ability to complete the grant. Mr. Bruning responded in an undated letter posted on July 18, 1991, asserting that the issue of grant completion was "moot, in that Thermalon by stopping work and NSF by interposing no objection thereto, means that the grant is 'in fact' terminated."

During this same period, plaintiff retained Walter John Taylor, a government contract consultant, to assist in its response to the audit. Mr. Taylor helped plaintiff in assembling documents to support its claimed costs and in reforming its internal accounting procedures. However, because plaintiff had paid most bills in the form of reimbursements to Mr. Miller, Mr. Taylor testified that he was unable to construct a meaningful general ledger.

By letters dated August 14 and 22, 1991, plaintiff submitted its audit response, accompanied by three volumes of documents to justify its costs. Plaintiff claimed total allowable costs of $158,629.00. The documents were reviewed by Mr. Bruning who, in his discretion, credited plaintiff for any expense for which it had provided some documentation. He determined that plaintiff should reimburse the NSF the amount of $53,053.00. This figure was predicated on plaintiff's amending its tax returns to reflect salary actually paid to Mr. Miller.

Mr. Miller discharged plaintiff's obligation under the promissory notes; amended his and plaintiff's tax returns; and reimbursed the NSF the amount of $2,667.00, representing interest earned on grant money invested in money market accounts and other adjustments to plaintiff's claimed costs. Full reimbursement, however, was never remitted. Instead, plaintiff and the NSF continued to negotiate the specifics of the Final Audit and Mr. Bruning's own determinations. After several months, Mr. Bruning attempted to settle the dispute with plaintiff by reducing the NSF's claims to $40,000.00. At one point an Audit Resolution Agreement was drafted by the NSF. Mr. Miller, however, did not sign the agreement. On March 8, 1993, Mr. Bruning issued the NSF's final determination that plaintiff owed the NSF $53,053.00.

By letter dated March 30, 1993, plaintiff formally appealed Mr. Bruning's final determination. The matter was referred to Robert Hardy, the NSF's Director of the Division of Contracts, Policy and Oversight, who assembled an *ad hoc* appellate panel. The panel requested and received additional documentation from plaintiff regarding disputed costs. Mr. Hardy accepted the panel's recommendation that the NSF be reimbursed for all but $46,171.00, representing disallowable costs attributable to salary, fringe benefits, and indirect costs—at least in part because "there is no evidence showing the Foundation made any attempt to assure that our grantee knew how it was expected to account for federal funds and could do so."

At the request of the NSF, plaintiff then submitted a statement of its termination costs by letter dated January 13, 1994. Plaintiff claimed audit response/settlement negotiation costs in the amount of $99,537.00, but acknowledged that its recovery was limit-

ed by regulation to the funds remaining on the grant. Aaron Asrael was appointed "termination settlement officer." By telephone, he requested and later received additional documentation from plaintiff to support its claimed termination costs. Mr. Asrael concluded that, although most of plaintiff's claimed termination costs were direct labor costs not allowed under the FAR, he would be willing to offset all of the disallowed costs "just to kind of make this thing go away." By letter dated May 31, 1994, plaintiff accepted on the condition that it be permitted to complete the grant. Mr. Asrael explained to Mr. Miller by telephone that this condition was impossible as he had no authority to reactivate the grant. By letter dated June 23, 1994, Mr. Asrael repeated his offer to offset disallowed costs, giving plaintiff until July 8, 1994, to accept. Plaintiff responded by letter of July 1, 1994, asserting that the grant was not terminated. The matter was subsequently forwarded to the NSF's collections department in the amount of $46,171.00.

4. *The suit in the Court of Federal Claims*

On December 21, 1994, plaintiff filed its complaint for breach of contract in the Court of Federal Claims, alleging that the NSF's Final Audit failed to comply with the provisions of the Grant Policy Manual and seeking $298,792.00 in compensatory and consequential damages.[3] Defendant counterclaimed in the amount of $109,398.00, plus interest, for monies expended to plaintiff pursuant to the grant, but disallowable as costs. Post-trial, plaintiff seeks $158,629.00 in allowable costs, and defendant counterclaims for $115,452.00.

On defendant's motion to dismiss for lack of jurisdiction, the trial judge determined that the NSF grant satisfied the criteria for an express or implied contract with the United States for purposes of the Tucker Act. *Thermalon Indus., Ltd. v. United States,* 34 Fed.Cl. 411, 415 (1995). Trial was held on June 7–10, 1999, in Washington, DC, and post-trial briefing was completed on October 7, 1999.

Pursuant to RCFC 77(f), on September 5, 2001, the case was transferred for decision to this judge, who informed the parties by order entered on September 17, 2001, of their option and right to request a retrial of the case. Defendant timely filed its preference for a decision on the record. Although plaintiff was allowed additional time to respond, it failed to communicate a decision and has now waived its right to retrial. *See Mo. Pac. Truck Lines, Inc. v. United States,* 2 Cl.Ct. 421, 425 (1983) (right to retrial waived by party's failure to move for new trial after reassignment). Upon reading the transcript of trial and reviewing the exhibits, it became apparent that the record did not specify the amounts claimed, those challenged, and the basis for each challenge. The court ordered supplemental briefing on October 23, 2001. Defendant filed on December 10, 2001, and plaintiff, which is no longer represented by counsel, made no filing. The court therefore issues the following opinion based on the existing trial record, as supplemented.

**DISCUSSION**

1. *Applicability of the Contract Disputes Act*

Before trial the trial judge concluded that, for purposes of the court's Tucker Act jurisdiction, the NSF's Phase II grant to plaintiff was an implied-in-fact contract. *Thermalon,* 34 Fed.Cl. at 415. Because the purpose of an NSF SBIR award is to foster technological innovation for its own sake, the parties agree that the award is not a "procurement contract" of the type governed by the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13 (1994 & Supp. V 1999) (the "CDA"). *See Busby Sch. of N. Cheyenne Tribe v. United States,* 8 Cl.Ct. 596, 600 (1985) (contracts designed to accomplish government social policy goals are outside the pale of the CDA's provisions); *Rock Point Community School Bd.,* 93–2 BCA ¶ 25,777, at 128,283, 1992 WL 390992 (CDA applicable to Government grant-related activity only because enabling statute expressly made CDA applicable). Because the grant at issue is not covered by the CDA, it is subject to the provisions of the

---

**3.** Plaintiff has abandoned its claim for consequential damages, presenting no evidence at trial as to these damages and making no mention of them in its post-trial brief.

Federal Acquisition Regulation (the "FAR") only insofar as the FAR is incorporated expressly by the terms of the grant. Of course, to the extent that the FAR provisions incorporated into the grant were themselves drafted to implement the provisions of the CDA, CDA cases which interpret those FAR provisions are relevant to the disposition of this case.

### 2. Standard of review

■ Under the CDA the court would review the NSF's determinations of allowable costs *de novo. See* 41 U.S.C. § 609(a)(3); *Wilner v. United States,* 24 F.3d 1397, 1401 (Fed.Cir.1994) (under CDA, "when suit is brought following a contracting officer's decision, the findings of fact in that decision are not binding upon the parties and are not entitled to any deference"). Defendant argues, and plaintiff does not appear to disagree, that this *de novo* standard also applies in the CDA's absence. In support of its position, defendant contends that the Federal Circuit in *Wilner* expressly adopted a pre-CDA preference for *de novo* review of contracting officers' decisions by contract appeals boards and applied that rationale to the judiciary. *See id.* at 1402 n. 8 (applying *Assurance Co. v. United States,* 813 F.2d 1202, 1206 (Fed.Cir.1987)). In any case, review of the instant record must be conducted *de novo* as the uncontroverted evidence at trial shows that the NSF made no findings of fact or law to which the court could defer. According to the contracting officer, Mr. Bruning, the Final Audit's conclusions are not binding because NSF policy places decisions concerning costs solely in the hands of the contracting officer. He also testified that the costs that he proposed to plaintiff were not based on factual findings. Rather, he represented that some costs were allowed as a matter of his "equitable discretion" and others were allowed "in the nature of settlement." Similarly, the appellate officer, Mr. Hardy, testified that the findings and recommendations of the NSF's appellate review panel are not binding on the NSF and that,

like Mr. Bruning, he himself made no factual findings. The court thus finds itself in the unenviable position of making findings as to allowable costs based on each party's showings consonant with its burden of proof rather than on the basis of reviewing the soundness of the audit and audit review, which were the focus of trial.

This incongruence between the focus of trial and the parties' post-trial assertions that *de novo* review is warranted mirrors that which occurred in *Wilner.* In that case the Federal Circuit found it reversible error for the Court of Federal Claims to purport to conduct a *de novo* review of a contractor's costs while at the same time deferring to the judgment of a contracting official. 24 F.3d at 1402. Specifically, *Wilner* faulted the trial court's reliance on the contracting officer's decision when the hapless contracting officer, who adopted the substance of his written decision in his trial testimony due to a present inability to recall remote events, merely "testified as to the process by which he arrived at his decision, not as to supporting facts." *Id.* at 1400–01. In the instant case, defense counsel presented eight witnesses, each an NSF officer, each of whom, with few exceptions, testified merely to the process by which he arrived at a decision, reiterating conclusions found in the Final Report. No witness was qualified as an expert. With one exception, neither party elicited testimony from anyone but Mr. Miller as to documentation entered into the trial record in support of plaintiff's costs, documentation that had not been made available at the time of the audit. In an attempt to delineate the nature of plaintiff's claims and defendant's counterclaims independent of the Final Audit, this court entered the October 23, 2001 order requiring defendant to submit an itemized list of individual expenses that it challenged for purposes of its counterclaim, including in the list the nature and amount of each expense, the evidence relied on for rejecting it, and the amount that defendant contended should be rejected.[4]

---

4. Plaintiff, which has been without representation since October 2001, was precluded from responding to defendant's subsequent summary by RCFC 81(d)(8), which requires that corporate

plaintiffs communicate with the court only by counsel. The court assures plaintiff that the lack of a response to defendant's summary does not unduly prejudice plaintiff's interests. Defen-

### 3. Burdens of proof

■ The burdens of proof in this case are determined by FAR subpt. 31.2 "Contracts with Commercial Organizations," which was incorporated into the contract by the General Conditions. FAR § 31.201–3(a) places the burden of proving the allowability of costs on plaintiff:

> No presumption of reasonableness shall be attached to the incurrence of costs by the contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be on the contractor to establish that such cost is reasonable.

Under this cost standard, plaintiff bears the burden of proving that claimed costs actually were incurred, that they were properly allocable to the grant, and that they were otherwise reasonable. *McDonnell Douglas Corp. v. United States,* 40 Fed.Cl. 529, 536 (1998), *rev'd on other grounds,* 182 F.3d 1319 (Fed. Cir.1999); *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir.1987). It must meet this burden by a preponderance of the evidence. *Ryan–Walsh, Inc. v. United States,* 37 Fed.Cl. 639, 649 (1997).[5]

■ Defendant legitimately disavows responsibility for proving the allowability of costs, but fails to acknowledge that it nevertheless carries the burden of establishing the existence of a legal provision, such as a statute, regulation, or contract clause, that would bar the claimed cost. *See Appeal of Lockheed–Georgia Co.,* 90–3 BCA ¶ 115,22,957, at 276–78, 1990 WL 133163 (citing cases that distinguish issue of reasonableness or allocability of costs from issue of legal bar to their

allowability and explaining that "[i]n both categories, each party argues the other has failed to meet its burden of proof"). Moreover, although defendant disclaims any burden whatsoever, defendant ignores the fact that it has filed a counterclaim seeking recoupment of NSF funds given to plaintiff as either not spent or properly disallowable as costs. "The burden is on the defendant to establish its counterclaim and the rule is well settled that the same character of proof is required to establish a counterclaim as to sustain any other claim." *Allis–Chalmers Mfg. Co. v. United States,* 79 Ct.Cl. 453, 462– 63 (1934); *see also* 29 AM. JUR. 2D *Evidence* § 160 (1994).

Defendant does not contend that promulgation of FAR § 31.201–3(a), which changed the burden of proof as to the allocability of costs from the Government to the contractor, also changed the Government's burden when it raises an affirmative counterclaim. The court's own review of the FAR finds nothing that would affect defendant's burden of proving the unallowability of costs once plaintiff has met its burden of proving that a particular cost is reasonable and allocable to the contract.

The burden of proof understandably is complicated in this case because the parties essentially make reciprocal claims based on the same facts. As a practical matter, however, failure of plaintiff to prove that a cost is not properly allowable does not render automatic defendant's recovery of the same amount pleaded in its counterclaim. Defendant has its own burden to prove that the cost is disallowed and recoverable by the

---

dant's submission merely organizes evidence already in the record, and defendant makes no argument challenging costs not already found in its post-trial brief. Although defendant's submission argues that plaintiff's claim for costs should be found in certain vouchers plaintiff submitted to the NSF which total $162,871.00, plaintiff's post-trial brief represents that plaintiff seeks costs in the amount of $158,617.00 as submitted to Mr. Bruning and included in the trial record as Defendant's Exhibit 36. To the extent that the court may find plaintiff to claim an amount different from that found in that exhibit, the discrepancy is attributable only to the fact that the documentary submissions substantiate a claim for a different amount.

5. Although plaintiff agrees that the CDA does not apply in this case and that it bears the burden of proving its costs, it nevertheless argues as a sweeping proposition that the court adopt the findings of Mr. Bruning and the "review official," as supported by the evidence of record. As discussed above, these individuals testified at trial that they made no such factual findings that the court could adopt. In fact, their testimony manifests a scorched-earth effort to settle plaintiff's claim short only of total capitulation to plaintiff's insistence that he be allowed to complete the grant.

Government. Defendant cannot rely successfully on the conclusions of the Final Audit when plaintiff has presented evidence at trial that was not before the auditor, Mr. Goodwin.

#### 4. *Termination*

In its complaint plaintiff alleged that the NSF improperly terminated its grant and that plaintiff is entitled to the balance of the grant by reason of having performed all of its requirements. Neither the grant letters sent to plaintiff nor the General Conditions incorporate the FAR's standard termination clauses. Instead, article 28 of the General Conditions explains:

> a. The grant may be suspended or terminated in whole or in part, when the Foundation believes that the grantee has materially failed to comply with the terms and conditions of the grant, or when the Foundation has other reasonable cause, or for any reason by mutual agreement between the Foundation and the grantee upon the request of either party, or when the parties cannot mutually agree to a termination.
>
> b The Foundation may immediately suspend or terminate a grant without notice when it believes such action is reasonable to protect the interests of the Government.

No dispute is present that plaintiff suspended work on the grant as of September 30, 1990. In his letter to plaintiff posted on July 18, 1991, Mr. Bruning implied that, because the NSF had not disputed plaintiff's unilateral suspension, the grant had been terminated effectively by mutual agreement as of September 1990. However, Mr. Bruning testified at trial that he terminated the grant in his letter because of the serious allegations levied in the Final Audit, the deficiencies in plaintiff's accounting system, and plaintiff's apparent unwillingness to reform those procedures without additional NSF support. This testimony correlates with the trial record as a whole, which evidences absolutely no intent by plaintiff to terminate the grant on a mutual basis and no representation by the NSF to plaintiff that it believed the grant had been terminated. *Cf. Rex Sys., Inc. v. Cohen,* 224 F.3d 1367, 1373

(Fed.Cir.2000) (explaining that mutual agreement to terminate cannot be inferred from breakdown of negotiations). It thus appears that while the NSF could have unilaterally terminated the grant in September 1990 pursuant to General Conditions § 28(b), it did not do so. Instead, the NSF unilaterally terminated the grant in Mr. Bruning's July 1991 letter. The Final Audit's contentions that plaintiff, *inter alia,* failed to comply with the FAR, the Grant Policy Manual, the General Conditions, and the most basic requirements of sound grant management pretermit plaintiff's claim for wrongful termination. The General Conditions expressly allowed Mr. Bruning to terminate the grant should the NSF reasonably believe material noncompliance had occurred. Because the termination in this case was not wrongful, plaintiff is not entitled to complete the grant and is not entitled to retain any unspent balance of the grant funds.

#### 5. *Allowability of costs*

According to article 11 of the General Conditions,

> [t]he allowability of costs and cost allocation methods for work performed under this grant, up to the amount specified in the grant, shall be determined in accordance with the applicable Federal cost principles in effect on the effective date of the grant and the terms of the grant.

The General Conditions also explain that, because plaintiff is a commercial concern, the applicable federal cost principle is FAR subpt. 31.2. The Phase II award was made September 6, 1988, so the 1987 version of the FAR applies. FAR § 31.201–2(a) provides:

> The factors to be considered in determining whether a cost is allowable include the following:
>
> (1) Reasonableness.
>
> (2) Allocability.
>
> (3) Standards promulgated by the CAS Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances.
>
> (4) Terms of the contract.

(5) Any limitations set forth in this subpart.

A reasonable cost is one that, as to its nature and amount, "does not exceed that which would be incurred by a prudent person in the conduct of competitive business." *Id.* § 31.201–3(a). Reasonableness is necessarily a factual inquiry. *Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 101, 324 F.2d 516, 518–19 (1963); *J.R. Cheshier Janitorial,* 95–1 BCA ¶ 27,376 at 136,441, 1994 WL 667149. A reasonable cost is allocable to the contract if it was incurred specifically for the contract, if it benefits both the contract and other work and can be reasonably distributed between them, or if it is otherwise necessary to the overall operation of the business. FAR § 31.201–4(c).

### 1) *Direct labor costs*

The majority of costs disallowed in the Final Audit represent salary that plaintiff claimed was paid to Mr. Miller. From September 1, 1988, to March 31, 1989, plaintiff issued to Mr. Miller approximately $104,832.28 in promissory notes, representing approximately $58,448.28 in compensation for his services as an employee and $46,384.00 for his services as a subcontractor. These amounts were in addition to approximately $1,000.00 per month paid to Mr. Miller as salary. A "Record of Work and Expenses" attached to each promissory note for employee services states a period of work (usually one month), followed by an aggregate number of hours multiplied by $30.00 per hour to reach a labor cost. The labor cost is followed by a payroll tax allowance at 20% of labor, a facilities usage allowance at 50% of labor, health insurance at a flat $100.00, office expenses at a flat $100.00, and blank lines used for miscellaneous expenses. The subcontractor notes were substantiated with an identical computation for labor, plus an overhead charge calculated at 100% of labor.

Mr. Miller testified that he was paid in promissory notes in lieu of salary because he believed plaintiff would be in a better position to complete the grant if he lent his salary back to the corporation. Because plaintiff's bank precluded it from drawing more than three checks a month, Mr. Miller himself would write checks for plaintiff's expenses from his personal account. While Mr. Miller claimed that he kept all receipts for plaintiff's purchases, he admitted that he did not maintain an organized system for tracking them. Nor did he use a recognized accounting method for calculating indirect costs, such as overhead. Instead, he merely estimated the costs reimbursed to him. Apparently, it has never been plaintiff's position that this system of salary reimbursement was adequate, and Mr. Miller maintained that, prior to the audit, he did not understand accounting concepts such as indirect costs, provisional rates, and the like. He also explained that, because plaintiff had no work or money besides the NSF grant, it "had no reason to keep track of things to the level of detail that's important in government contracting." Among other problems, its *modus operandi* caused plaintiff to request funds from NSF in excess of its immediate cash needs and correspondingly to compensate Mr. Miller in excess of the hours billed to the grant. Further, it caused plaintiff to misclassify many indirect costs as direct costs in violation of FAR §§ 31.202(a) and (b). *See, e.g., Appeal of Tom Shaw, Inc.,* 91–1 BCA ¶ 23,338, at 117,038–39, 1990 WL 138187 (contractor cannot recover cost of overhead provided to its subcontractor as direct cost when overhead rate already included those costs).

In its proposal to the NSF, plaintiff requested $76,750.00 in direct labor costs, itemized as follows: $32,300.00 in salary to Mr. Miller, $42,650.00 in salary to other professionals, and $1,800.00 in salary for secretarial-clerical work. At the time of the audit, plaintiff claimed $69,493.00, all as salary to Mr. Miller. Post-trial, plaintiff seeks $73,977.00.

#### a) *Salary—allowability*

Plaintiff established at trial that Mr. Miller's only work during the audit period was for the NSF grant and argued that his entire salary thus is allocable to the grant. Defendant first challenges the entire amount of Mr. Miller's salary on the ground that it is not allowable because plaintiff failed to report any amount of income on its tax returns. FAR § 31.205–6(b)(2)(i) provides that for a

closely held corporation, such as a plaintiff, salary costs "shall not be recognized in amounts exceeding those costs that are deductible as compensation under the Internal Revenue Code and regulations under it." At the time of the audit, plaintiff had not reported any amount as salary to Mr. Miller. At trial plaintiff produced amended corporate and personal 1991 tax returns. Plaintiff therein reported $73,997.00 as salary paid to Mr. Miller and $32,342.00 as reimbursed expenses paid to Mr. Miller. In a September 25, 1992 letter to plaintiff, its consultant, Mr. Taylor, explained that because plaintiff is a cash-basis taxpayer, the salary and expenses could not be reflected in the years earned, but, rather, was required to be reported in the year paid.

■ Defendant rejects plaintiff's attempt to claim Mr. Miller's salary, contending that the 1991 return does not compensate for the deficiencies in plaintiff's payment methods. According to defendant, the promissory notes fail to qualify as allowable deferred compensation. The 1987 version of the FAR, §§ 31.205–6(k)(1)–(2), states that deferred compensation is allowable when it is based on current or future services. Moreover, the costs of deferred awards must comply with FAR § 30.415. In turn, section 30.415–50(a) states, in pertinent part:

> The contractor shall be deemed to have incurred an obligation for the cost of deferred compensation when all of the following conditions have been met . . .
>
> (1) There is a requirement to make the future payment(s) which the contractor cannot unilaterally avoid.
>
> (2) The deferred compensation award is to be satisfied by a future payment of money, other assets, or shares of stock of the contractor.
>
> (3) The amount of the future payment can be measured with reasonable accuracy.
>
> (4) The recipient of the award is known.

If these conditions are not met, FAR § 30.415–50(b) mandates that the cost of deferred compensation be assigned to the cost accounting period in which the compensation actually is paid to the employee.

Because plaintiff is a closely held corporation whose sole employee and sole owner is Mr. Miller, defendant argues that the payment of the promissory note was an obligation that plaintiff could avoid unilaterally and that such payment therefore cannot qualify as allowable deferred compensation. Notably, defendant does not argue that a promissory note is *per se* unallowable as a salary cost in a government contract. *See* FAR § 31.205–6(a) ("Compensation for personal services includes all remuneration paid currently or accrued, *in whatever form* and whether paid immediately or deferred . . . ." (emphasis added)); *Remedial Care, Inc. v. Shalala,* 1994 WL 321219, *3–5, 1994 U.S. Dist. LEXIS 8915, *11–15 (E.D.La. 1994) (disallowing amount of promissory note paid to employee under FAR's medical reimbursement provisions because, as factual matter, note in question did not meet legal criteria of negotiable promissory note).

Unfortunately, defendant neither elaborates on its argument nor cites any authority for the proposition that a promissory note ceases to be an enforceable negotiable instrument when the owner of a closely held corporation pays himself promissory notes as deferred compensation. Indeed, it would seem that defendant's argument ignores the nature of the closely held corporation. A closely held corporation is a legal entity by fiction of law, but nonetheless a distinct legal entity:

> [L]inguistically speaking, the employee and the corporation are different "persons," even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.

*Cedric Kushner Promotions, Inc. v. King,* 533 U.S. 158, 121 S.Ct. 2087, 2091, 150 L.Ed.2d 198 (2001). Although not knowledgeable about the FAR, Mr. Kinsella, plaintiff's accountant, presented uncontroverted testimony that generally accepted accounting principles recognize payment of executive salary by promissory note and explained how the closely held corporation would account for this form of payment in its submissions to

the IRS. To the extent the FAR discusses compensation for owners of closely held corporations, it only requires that compensation in lieu of salary not constitute a distribution of profits, FAR § 31.205–6(b)(2)(i), and, as discussed above, not exceed the amount deductible as compensation under the Internal Revenue Code.[6] Defendant therefore has failed to prove that plaintiff's promissory notes do not qualify as deferred compensation.

Defendant next argues that the costs not be considered allowable because no actual tax was paid. On his personal income tax return, Mr. Miller reported $73,977.00 as income attributable to his salary. Defendant notes that because of non-passive losses also reported on that return, Mr. Miller did not actually report taxable income that year. Defendant also makes much of the fact that at trial Mr. Miller could recall neither the details of these losses nor the details of the supporting materials for the tax return. Defendant then parlays these facts into an argument that the salary is not allowable because presumably no net loss was suffered by either plaintiff or Mr. Miller. To the contrary, the return shows that Mr. Miller remitted $7,255.00 to the IRS in 1991. Accordingly, defendant must mean to argue that Mr. Miller presumably paid less income tax than he would have paid were it not for his non-passive losses. This argument again ignores the recognition of a closely held corporation as a legal entity. As the contracting corporation, plaintiff's duties under the FAR were satisfied when it amended its tax return to account for the payment of deferred compensation.[7] Assuming that Mr. Miller somehow inappropriately reported his own income, defendant cites no law declaring the consequences for a closely held corporation under either the FAR or the Internal Revenue Code due to such a discrepancy, nor did any witness testify on this subject. It may be true that "Thermalon's use of promissory notes enabled Mr. Miller to defer the recognition of income by as much as four years and to time it so as to avoid any payment of taxes," and that this situation might be construed as "tax fraud." Def.'s Br. filed Sept. 14, 1999, at 33.[8] But defendant fails to explain how this assertion has any bearing on the issues of whether plaintiff's use of promissory notes was appropriate in the first instance, why Mr. Miller's salary should not be applied to the grant now that it has been reported to the IRS by both plaintiff and Mr. Miller, or why the delay has any bearing on any issue other than Mr. Miller's potential personal liability to the IRS.[9] The issue for purposes of allowability is whether plaintiff's deferring compensation was proper, and defendant has made no showing to the effect that plaintiff's corporate return was deficient under the Internal Revenue Code.

6. Defendant's argument on this point echos the language of the Final Audit's conclusion that the IRS "requires that a shareholder-employee, of a closely held corporation that is using the cash method of accounting, deduct salaries expense only in the year paid. Accordingly, the amounts claimed are not deductible for income tax purposes because the amounts were not paid. Therefore, the salaries are not allowable under the FAR." As discussed above, the FAR would allow deferred compensation as long as the cash basis corporation deducts such compensation as an expense on its tax return in the year that it was actually paid. Whether the FAR would allow this result when a grantee amends its returns, retroactively deeming salary paid to be deferred compensation is an issue neither explored at trial nor addressed in the parties' briefs.

7. The record does not reflect whether plaintiff claimed Mr. Miller's salary as paid in its previous returns, and Mr. Miller could not recall that specific information.

8. The court notes, however, that plaintiff paid Mr. Miller's salary in 1991 at the direction of the NSF.

9. Defendant summarily argues that the "non-passive tax loss on Mr. Miller's amended 1991 tax return, if not actual tax fraud, is directly contrary to the policy underlying 48 C.F.R. § 31.205–6(b)(2)(i)." Def.'s Br. filed Sept. 14, 1999, at 33. This provision states that for closely held corporations, "determination should be made that salaries are reasonable for the services rendered rather than being a distribution of profits." The trial record, however, does not reflect on the nature of plaintiff's non-passive losses, and the court cannot simply assume that all non-passive losses incurred by a closely held corporation properly are characterized as a distribution of profits. Moreover, defendant does not elaborate on the policy behind this provision or how it may have been violated in this case.

Because the promissory notes qualify as deferred compensation, the FAR does not require that they actually be paid in the year that the obligation accrued. Accordingly, the FAR does not bar plaintiff from claiming Mr. Miller's salary as an allowable expense.

### b) *Salary—time records*

■ Having determined that salary paid to Mr. Miller in the form of promissory notes is allowable, the court turns to the issue of whether plaintiff can substantiate the amount of salary claimed. In its Final Audit, the NSF maintained that plaintiff's method of reporting Mr. Miller's time in monthly increments was not sufficiently precise to justify allocation to the grant. Because the hours were presented as lump sums, Mr. Goodwin could not determine plaintiff's other research activities and thus could not determine whether the hours and corresponding indirect costs properly were allocable to the grant.[10] Plaintiff subsequently produced time records in the form of individual "day-timer" records for the grant period. The day-timer records consist of individual daily calendar pages on which appear handwritten notations signifying appointments and phone numbers. On top of certain pages, "NSF" appears, followed by a number. Some numbers are followed by the notation "hrs.," for example, "NSF 6 hrs." The color of ink varies among days and sometimes differs between the NSF entry and the remainder of the page. According to a 1992 independent audit of these records performed at plaintiff's request by Cannon Business Services of Long Beach, California, the day-timers reflect total NSF hours of 2,443.39: 2,014.30 attributable to Mr. Miller's work as an employee and 429.09 attributable to his work as a subcontractor.

Mr. Goodwin testified that he would have considered the day-timer records if they had been presented during his audit and if Mr. Miller had at least orally "fill[ed] in the blanks" so as to show how the calendar hours fit into 100% of his time. Mr. Miller explained that he did not provide Mr. Goodwin with these records because Mr. Goodwin only asked for "time cards" which plaintiff did not maintain. He repeatedly asserted that he had no other work during the audit period, so Mr. Goodwin would never have been able to find other work so as to account for 100% of Mr. Miller's time, either at the audit or on the day-timer records. Mr. Miller further stated that, because plaintiff was a sole proprietorship engaged in no other research at the time, no reason existed to chronicle his time more closely. Nothing in the record contradicts this assertion.[11] With no other work to apportion, it is not unreasonable to conclude that the records account for 100% of Mr. Miller's direct labor costs. Indeed, when asked to elaborate, Mr. Goodwin explained that when he wanted the records to reflect 100% of Mr. Miller's time, he intended plaintiff to account specifically for hours spent on administrative tasks for purposes of substantiating indirect costs. This is a separate issue, however, from whether the records substantiate Mr. Miller's direct labor on the grant. Plaintiff thus has met its burden of proof as far as substantiating time spent by Mr. Miller on the grant.

Defendant presented Charles Ziegler, who, in his capacity as a grant specialist for the NSF, assisted Mr. Bruning in his attempt to negotiate a settlement with plaintiff. Regarding the day-timer records, Mr. Ziegler testified that while, for some days "you might

---

**10.** In his audit Mr. Goodwin applied the comprehensive time record standards required for salaries and wages by OMB Circular A–122. According to the General Conditions, OMB Circular A–122 applies to "Other Non Profit Organizations." Mr. Goodwin explained that, although the grant terms do not make this circular applicable to commercial enterprises, NSF auditors use it to assist them in determining what constitutes adequate documentation under the FAR regardless of the type of organization. Plaintiff thus vigorously contests the validity of the Final Audit and accuses the NSF of failing to conform to its own General Conditions. This challenge is superflu-

ous because, as discussed above, this case does not turn on an audit of any of the NSF decisions. Of more import, defendant does not argue that the court should adopt the record-keeping standards found in OMB Circular A–122.

**11.** Mr. Miller did obtain an SBIR Phase II award from the National Aeronautics and Space Agency (NASA) under the name S.D. Miller & Associates. NASA's pre-award audit of S.D. Miller & Associates dated May 1992 disclosed no significant problems or concerns with Mr. Miller's ability to comply with the terms of that contract.

be able to infer that some NSF work was done," the records as a whole lacked a "solid correlation between the handwriting and the number of hours claimed." By "solid correlation," Mr. Ziegler meant a signature on each page by the employee or a supervisor, payroll records, or journals. Consequently, he concluded: "If this had been my decision to make as an audit resoluting [sic] official, I would not have accepted these Daytimers as adequate support for hours worked on an NSF project." He added: "The fact that the time documents were not provided to the auditor at the time of his site visit would give me reservations that there would exist the possibility somebody could have filled these out after the audit report."

Defendant builds on Mr. Ziegler's testimony to argue that the day-timer records are too unreliable to support allocation to the grant. In particular, it notes the records do not contain any descriptions of Mr. Miller's daily activities. They do not account for time spent on non-grant activities. They are not tied into other accounting records, such as payroll records, general ledgers, or financial statements. Finally, no evidence was introduced at trial, beyond Mr. Miller's testimony, that the records were created contemporaneously with the work performed. In effect, defendant asks the court to find that although admissible, the day-timer records do not discharge plaintiff's burden of proving the allocation of 2,443.39 hours of Mr. Miller's time to the grant.

As the transferee judge rendering this opinion was not the trial judge, this court is in a difficult position in terms of making findings based on the credibility of witnesses. See Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1067 (Fed.Cir. 2001) (credibility determinations by trial court "are virtually never clear error"); First Interstate Bank of Billings v. United States, 61 F.3d 876, 882 (Fed.Cir.1995) (acknowledging that court reviewing trial record not in position to weigh credibility of witnesses). The court thus takes all statements from the transcript at face value and evaluates them against the contents of documentary exhibits.[12]

Mr. Ziegler's personal opinion as to the credibility of the day-timer records raises perhaps obvious questions about why the records were not produced at audit, but fails to impeach the assertion that the day-timers constitute contemporaneous records sufficient to show hours worked by Mr. Miller. First, Mr. Ziegler was not qualified as an expert and did not give expert testimony concerning the adequacy of the records under any accounting or reporting standard that might assist the court in deciding the weight to give them. Second, Mr. Ziegler was asked to examine the records more or less in the abstract; he was not asked to consider them in light of the fact that plaintiff had no other grant activity, nor in light of the fact that the records were intended to supplement plaintiff's "Record of Work and Expenses" attached to plaintiff's promissory

---

12. The court does infer from the transcript that the presiding judge had concerns about Mr. Miller's credibility, especially concerning the witness's claims to the effect that the NSF failed to educate him about his bookkeeping responsibilities under the grant. The court shares the same concern based on its own review of the record. Mr. Miller's posturing as a naif concerning NSF grants is belied by his comparatively sophisticated testimony on other technical subjects. Moreover, plaintiff is charged with constructive knowledge of the Grant Policy Manual and FAR requirements, which were referenced in the grant solicitation and the grant award letters. The court conducts a de novo review of costs submitted at trial, and Mr. Miller does not maintain that these submissions are erroneous or the result of uninformed judgment. Mr. Miller's knowledge and record keeping practices at the time of the Final Audit are thus largely irrele-

vant. Defendant nevertheless underscores these credibility concerns, suggesting that this case is permeated with fraud, although it brings forth no specific charge of fraud as to any particular cost submission.

By its terms the FAR would not allow fraudulently allocated costs, but the court is not in a position to infer fraud. With the exception of the day-timer records, defense counsel did not elicit testimony as to the credibility of plaintiff's cost submissions. Defendant failed to develop testimony on the subject of why Mr. Miller was at a loss to understand what documents the NSF required and for what purposes. If defendant considered any particular document so unreliable as to lack probative value, it could have challenged that document's admission into evidence. It did not. Certainly, this trial strategy was made with the assumption that the trial judge, who actually observed witnesses, would render an opinion.

notes and available at the time of audit. Third, Mr. Ziegler testified that, because he knew the records had not been presented at audit, he would want to "look into any salary cost more closely." Finally, Mr. Ziegler never maintained that he would actually discount the records on the ground that they were not contemporaneously produced, but merely acknowledged a possibility that they were not. He stated, in fact, that for some days "you might be able to infer that some work was done." Defendant did not challenge any specific hours or days, but instead relied on a broad argument of credibility. Defendant's speculation as to the contemporaneous nature of the records does not suffice to impugn plaintiff's showing that Mr. Miller spent 2,334.90 hours on the grant.

c) *Salary—labor rate—principal investigator* [13]

■ Plaintiff seeks salary allocable to the grant at a rate of $30.00 per hour, which would be allocated, as follows: 2,014.30 hours of work as a principal investigator = $60,429.00; 429.09 as a subcontractor = $12,872.70.[14] According to FAR § 31.205–6(a)(2), Mr. Miller's compensation as principal investigator is allowable, provided that the compensation in total is "reasonable for the work performed." Defendant does not dispute that the $30.00 labor rate is reasonable for Mr. Miller's position. Instead, defendant first argues, bereft of authority, that any amount paid to Mr. Miller in excess of the $32,300.00 proposed as salary for the principal investigator in plaintiff's proposed budget must be discounted. Neither the SBIR Program Solicitation nor any award letter mentions such a ceiling as a condition of the grant. Similarly, the General Condi-

tions are silent on the issue, except to allow costs only up to the amount specified in the grant and to incorporate FAR subpt. 31.2. FAR § 31.201, in turn, defines allowability, reasonableness, allocability, and costs, without any reference to proposed budget amounts. *See also Appeal of Stanley Aviation Corp.*, 68–2 BCA ¶ 7,081, at 32,786, 1968 WL 610 (actually experienced cost does not become unreasonable merely because it differs from one originally proposed). That plaintiff's proposed salary is not a ceiling for purposes of cost allocability is consistent with the testimony of Mr. Goodwin, who explained at trial that a grantee "can have actual costs different than what the amounts are, you know, in the approved budget by line item," so long as the grantee "[s]tay under the ceiling."

■ Defendant next argues that the $30.00 labor rate is unreasonable because it exceeds the labor rate in plaintiff's proposal. Plaintiff's proposed budget represented that Mr. Miller would spend eight calendar "NSF Funded Person" months on the grant, but contained no labor rate.[15] Defendant imputes into the proposed budget an implicit rate of $23.28, the same rate used by Mr. Bruning in his settlement offer, which is derived by converting the proposed labor months into a total number of hours and dividing that figure into the $32,300.00 salary as stated in the budget. Assuming the appropriateness of this methodology, defendant again cites no authority for the proposition that the proposed budget presents a categorical ceiling on reasonable salary costs. Notably, Mr. Bruning did not testify that plaintiff was bound to the labor rate he believed plaintiff proposed in its budget. He testified

---

**13.** Although plaintiff now claims that all of Mr. Miller's time was work expended as a principal investigator, that contention is belied by the audit of the day-timer records which, clearly differentiate between hours Mr. Miller worked as a principal from hours he worked as a subcontractor. Mr. Miller admitted that some of the work he performed was in the nature of a subcontractor. In these circumstances the court cannot allow plaintiff to characterize the entire amount as salary, even if properly reported as such to the IRS.

**14.** Plaintiff's total level of compensation would thus be $73,301.70, approximately $676.00 less

than the amount reported on plaintiff's amended tax return. This is because Mr. Taylor, who prepared the 1991 tax returns before the day-timer records were audited in 1992, used the figure of 2,465.90 instead of 2,443.39 hours.

**15.** The definition of an NSF "person month" is unclear. According to the testimony of Messrs. Bruning and Miller, "person month" means time actually spent working on the grant, rather than a period of time during which a researcher would work on the grant. The record does not disclose how many hours comprise an NSF "person month."

merely that he improvised this calculation because he believed "NSF had the right to believe that we could get the services proposed for the rate that was indicated in the budget. That's all."

FAR § 31.205–6(a)(4) does state:

No presumption of allowability will exist where the contractor introduces major revisions of existing compensation plans or new plans and the contractor—

(i) Has not notified the cognizant [contracting officer] of the changes either before their implementation or within a reasonable period after their implementation . . . .

Further, FAR § 31.205–6(b)(2)(ii)(A) directs contracting officers to challenge "[a]ny change in a contractor's compensation policy that results in a substantial increase in the contractor's level of compensation" when such changes are not reported. Because plaintiff did not resolve to compensate Mr. Miller at the $30.00 rate until two days after the grant was awarded, and because this increase was not reported to the NSF, defendant argues that the $30.00 rate is an unreasonable increase in compensation from the $23.28 rate implicit in plaintiff's proposed budget.

Plaintiff rejoins that the $30.00 rate does not represent a change, as Mr. Miller testified that he intended for the proposal to reflect his compensation at $5,000.00 a month, approximately a $30.00 rate. Mr. Miller maintained that, when he drafted the proposal, he did not know the difference between calendar months in a lay sense and calendar months defined as person months by the NSF. Moreover, in his mind, he would not work all the time during a calendar month, so his proposal of eight months of labor was a proposal to spend less time than would be spent by a person working a total of eight calendar person months. Mr. Miller also believed that the NSF would use the labor estimate only for purposes of scheduling research progress and not as a basis for

allowing compensation, thereby admitting that his proposal failed to inform the NSF as to the actual amount of time he intended to work on the grant.

Assuming that plaintiff implicitly did propose a rate of $23.28, defendant has failed to prove that a $6.72 per hour increase in Mr. Miller's salary represents either a "major revision" in plaintiff's compensation plan or a "substantial increase" in Mr. Miller's level of compensation. Mr. Miller's admission does not change this result. Defendant makes no argument to the effect that the $6.72 difference is a "substantial increase" under the FAR. As a policy matter, the FAR seeks to protect the Government from contractors who would use the government contract to obtain an uncompetitive commercial or personal advantage. For this reason, FAR § 31.205–6(b)(2)(ii)–(iv) describes unreasonable increases as those concurrent with an increase in the ratio of government work to commercial work, those made when the business is not subject to competitive restraints, or those in excess of the amount deductible under the Internal Revenue Code. Defendant, however, makes no particularized argument along these lines.

The court's own review of the available precedent informs that whether a change is material or substantial depends not upon how the actual salary cost differs from that proposed, so much as whether the change is in line with compensation in similarly situated organizations or is the reasonable result of changed circumstances. FAR § 31.205–6(b)[16]; see e.g., Henry Ericsson Co. v. United States, 104 Ct.Cl. 397, 427–28, 62 F.Supp. 312, 326 (1945) (retroactive salary increase to family members in closely held corporation, made when government contract was almost finished, appeared as unallowable distribution of profits); In re Appeals of Techplan Corp., 96–2 BCA ¶ 28,426, 1996 WL 391461 ("FAR provisions allow the flexibility necessary to determine reasonableness based upon generally accepted practices in the compen-

---

16. FAR § 31.205–6(b) provides:

Facts which may be relevant include general conformity with the compensation practices of other firms of the same size, the compensation practices of other firms in the same industry, the compensation practices of other firms in the same geographic area, the compensation practices of firms engaged in predominately non-Government work, and the cost of comparable services obtainable from outside sources.

sation field."). Based on these considerations, the determination that a salary or a salary change is so substantial as to be unreasonable is usually established by expert testimony. *See, e.g., Appeals of Ralph M. Parsons Co.,* 91–1 BCA ¶ 23,648, at 118, 460–61, 1990 WL 265107; *Appeal of Lulejian & Assocs., Inc.,* 76–1 BCA ¶ 11,880, at 56,921–22, 1976 WL 1917. Defendant cannot meet its burden of proof by noting merely that Mr. Miller's compensation was changed by $6.72 an hour immediately after the grant was awarded.

Defendant next contests the amount of salary as unreasonable when measured against plaintiff's apparent progress on the grant. Mr. Miller testified that when plaintiff suspended work on the grant, plaintiff was on the cusp of producing a garment, identified as Task 3.2 in plaintiff's proposal to the NSF. Defendant challenges whether plaintiff had progressed this far, as the documentary record lacks invoices for the purchases of some materials ostensibly necessary to complete a prior task. Comparing the technical progress originally proposed with that reported in plaintiff's restated cost submission, defendant seizes the conclusion that "the amount of work Mr. Miller could reasonably have expended on the parts of the research project that were completed is not more than a few hundred hours." Yet, defendant does not ask for a finding that the number of Mr. Miller's allowable direct labor hours be limited to "a few hundred." Rather, defendant seeks to raise "serious questions about the reliability and credibility of Mr. Miller's testimony." Defendant's argument fails to do so. The NSF never took issue with plaintiff's progress on the grant in relation to costs. Although defense counsel questioned Mr. Miller briefly about plaintiff's technical progress, this subject was not developed at trial. Defendant might have con-

structed a more focused argument as to why the absence of invoices or a discrepancy in progress undermines a finding that the day-timers represent a contemporaneous record of Mr. Miller's activities. The record is incomplete on this point.

The court finds that 2,014.30 hours of Mr. Miller's direct labor as principal investigator for the grant are allowable at the rate of $30.00 an hour, for a total of $60,429.00.

d) *Salary—labor rate—subcontractor*

■ The day-timer records reflect 429.09 hours of Mr. Miller's time expended as a "subcontractor." According to the NSF Grant Policy Manual § 516.1(a), costs to outside consultants are allowable only if the outside consultant is not an officer or employee of the performing organization. This limitation is also found in FAR § 31.205–33(a). Mr. Miller's hours as a subcontractor thus are not an allowable cost of the grant. In its proposal plaintiff advised the NSF that Battelle Memorial Institute ("Battelle") and Kansas State University would provide assistance on the grant at an estimated $67,080.00. Plaintiff adjusted this figure to $47,080.00 after the NSF informed plaintiff that approval would depend upon reducing the overall budget by 10%.[17] Mr. Miller testified that he was able to reduce the subcontractor budget by reallocating work to himself, although plaintiff did not increase the amount budgeted for Mr. Miller as principal investigator. The General Conditions expressly require that changes to the principal investigator or his/her level of effort be submitted to the NSF for written approval. Plaintiff did not do so. Mr. Miller admitted that he performed work outside the scope of his originally proposed duties, and plaintiff now cannot maintain that those hours do not represent a change to Mr. Miller's total level of effort on the grant.

17. Defendant does not challenge $32,807.00 actually paid to the independent subcontractors, the same amount not challenged by the auditors. In its letter to Mr. Bruning, however, plaintiff claims $32,957.00. The parties do not explain the $150.00 difference, and the Final Audit questions only the amount of subcontractor costs that plaintiff claimed were paid to Mr. Miller. According to the court's own review of the documentary evidence, the $150.00 represents a Sep-

tember 1989 payment to "Jakubowski" and is a cost that Mr. Bruning allowed as supported by documentation. Because this cost was outside the scope of the Final Audit and because defendant makes no specific argument regarding this cost, the Government cannot recoup this amount, and plaintiff is entitled to keep $32,957.00 in payments actually paid to subcontractors.

According to plaintiff's 1991 tax return, as supported by the day-timer records, Mr. Miller was paid $12,872.70 for his work as a subcontractor.[18] This amount is unallowable.

### 2) Direct costs—fringe benefits

■ Just as overall compensation must be reasonable to be allowable, the allowability of fringe benefits depends on the reasonableness of the entire compensation package. *Appeal of Lulejian & Assocs., Inc.*, 76–1 BCA ¶ 11,880, at 56,946, 1976 WL 1917. Under FAR § 31.205–6(m), "the costs of fringe benefit are allowable to the extent that they are reasonable and are required by law, employer-employee agreement, or an established policy of the contractor."

■ Plaintiff seeks $13,615.00 in fringe benefits. Plaintiff's budget proposal lists $2,400.00 for fringe benefits. According to its August 22, 1991 letter to Mr. Bruning, plaintiff incurred $18,000.00 in vacation/holiday/sick-hours paid to Mr. Miller at the rate of 200 hours per year at $30.00 an hour. That letter takes the position that the 200 hours are "customary allowances for vacation (10 days), holidays (10 days) and sick leave (5 days)."[19] The letter also specifies health insurance in the amounts of $939.00 for 1988, $1,265.00 for 1989, and $862.00 for 1990, for a total of $3,066.00.

Plaintiff has not met its burden of proving that Mr. Miller's vacation/holiday/sick-hours were reasonably and actually incurred. Its letter to the NSF does not explain how these costs were "required by law, employer-employee agreement, or an established policy of the contractor," and no document in the record supports such a finding. Furthermore, plaintiff's letter to Mr. Bruning is insufficient to prove that these benefits were actually incurred by Mr. Miller and paid by plaintiff because the letter lacks supporting documentation.

Defendant argues that $1,900.00 attributable to health insurance must be disallowed as unsupported by the documentary record. Plaintiff's submission to Mr. Bruning claims $3,066.00 in health insurance costs, but defendant does not explain the discrepancy between the amount claimed by plaintiff and the amount it now challenges. At trial plaintiff produced copies of checks that it forwarded it Mr. Bruning to support health insurance costs. Five checks, dated from 1988 through February 14, 1989, each sent to "Blue Cross" in the amount of $246.00, are from the account of Jane M. Miller and signed by her. Thereafter, the checks are drawn from the account of Stephen D. Miller. Two checks in 1989 are made out to Blue Cross in the amount of $405.00. Another check, dated November 22, 1989, is made payable to "AHCAA" in the amount of $105.00. An amount of $104.00 is paid by check to "Transit Life" on the same date. For 1990 two checks each in the amount of $249.00 are made payable to "NASE" and signed by Stephen D. Miller, and one check made out to NASE is in the amount of $319.00 and signed by Jane M. Miller.

Plaintiff's promissory notes, which include a monthly reimbursement of $100.00 for health care, establish that plaintiff had a policy of reimbursing Mr. Miller for health care costs and that it did so reimburse him. As it was plaintiff's policy to reimburse Mr. Miller for health care, Mr. Miller's personal checks to Blue Cross, AHCAA, Transit Life, and NASE establish that Mr. Miller actually incurred health care expenses for which he was reimbursed by plaintiff. The checks totaling $1,517.00 drawn on Mr. Miller's personal account, checks that defendant does not contest were remitted to health care provid-

---

18. As compared to the $30.00 labor rate used for Mr. Miller's work as principal investigator, plaintiff paid him a rate of $50.00 as a subcontractor in the promissory notes. Mr. Miller, however, could not recall the rationale for paying himself a higher labor rate as a subcontractor than as a principal investigator. He apparently also overlooked that his tax return compensates all of his work at a rate of $30.00.

19. While the court questions whether plaintiff's retroactive application of holiday, vacation, and sick pay as of August 22, 1991, satisfies FAR § 31.205–6(a)'s requirement that liability actually accrue during the period of contract performance, defendant makes no argument along these lines. The court cannot credit defendant's bald assertion that "it is illogical to contend that a sole proprietor with no employees could truly take a paid vacation." Def.'s Br. filed Sept. 14, 1999, at 35 n. 21.

ers, are allowable costs. The remaining amount drawn from the account of Jane M. Miller, however, cannot be allocated to the grant. Plaintiff has not attempted to explain why some of Mr. Miller's health care reimbursements were paid personally by Mrs. Miller. Further, no record establishes that plaintiff remitted any reimbursement to Mrs. Miller.

Plaintiff has proved that it actually incurred $1,517.00 in costs for fringe benefits representing health care reimbursements. In its letter to Mr. Bruning, plaintiff represented that 16% of its fringe benefits in 1988 were allocable to the NSF, 65% for 1989 and 50% for 1990. No checks in 1988 were written by Mr. Miller. Mr. Miller expended $1,019.00 for health care in 1989, making $662.35 allocable to the grant. He expended $498.00 in 1990, making $249.00 allocable. Plaintiff's total recovery for the fringe benefit of health care is thus $911.35. Plaintiff did not meet its burden of proof as to the remaining $12,703.65 in fringe benefit costs.

### 3) Other direct costs

Plaintiff seeks $1,919.00 for travel, $4,414.00 for equipment, and $6,429.00 for materials and supplies as reasonable and allocable to the grant. Defendant does not challenge these amounts.

### 4) Indirect costs

█ Under plaintiff's pre-audit accounting procedures, plaintiff reimbursed Mr. Miller for "facility use costs" calculated at 50% of Mr. Miller's direct labor, or a provisional direct rate of $15.00. According to Mr. Miller, the facility use charge consisted of Mr. Miller's estimate of his costs related to facilities, i.e., rent, phone, gas, electricity, and "all the other costs that went into keeping the shop open." At the time of audit, plaintiff claimed such facility use costs as direct costs, paid as salary to Mr. Miller. In its submission to Mr. Bruning, plaintiff properly reclassified such facility use costs as indirect costs. Under FAR § 31.203(a):

An indirect cost is any cost not directly identified with a single, final cost objective, but identified with two or more final cost objectives or an intermediate cost objective. It is not subject to treatment as a direct cost. After direct costs have been determined and charged directly to the contract or other work, indirect costs are those remaining to be allocated to a final cost objective if other costs incurred for the same purpose in like circumstances have been included as a direct cost of that or any other final cost objective.

Plaintiff now seeks $25,318.00 in indirect costs, representing costs incurred in relation to rent, electricity, phone, shop supplies, office supplies, professional services, postage and shipping, fees and licenses, dues and subscriptions, business education, equipment rental, indirect labor, and indirect fringe. The terms of the grant, however, specify that indirect costs are allowable only on a fixed-cost basis. The NSF Policy Manual, published in 1983, states that NSF grants to commercial organizations "contain a maximum provisional indirect cost rate which is subject to downward adjustment only. In some instances NSF may elect to use a fixed dollar amount in lieu of a maximum provisional rate." This same limitation appeared in the NSF's September 27, 1989 grant letter awarding additional support to plaintiff.[20] In its proposal to the NSF, plaintiff proposed $2,000.00 for indirect costs, listing $800.00 for shop supplies and $1,200.00 for offices supplies, phone, and shipping. Allowable indirect costs therefore are limited to the $2,000.00 proposed by plaintiff in its budget.

█ Plaintiff claims $4,025.00 in rent incurred for 1988, $4,800.00 in rent incurred in 1989, and $4,800.00 in rent incurred in 1990 and paid to "R.W. Williams," for a total of $13,265.00 over the grant period. According to a title search conducted by Harper Realty, Richard Williams and another individual, whose name is illegible, own the property which plaintiff lists as its business address. Mr. Williams submitted an affidavit to the effect that although he had no written lease agreement with plaintiff, he received the

---

**20.** The fact that the NSF's 1988 award letter specifically did not mention this cap on indirect costs is irrelevant, as this limitation appeared in the Grant Policy Manual, which was incorporated into that letter by reference.

$4,025.00 in rent from Mr. Miller in 1988, $4,800.00 in rent in 1989, and $4,800.00 in rent in 1990. Plaintiff's rent is therefore a reasonable charge to the grant.

Defendant seeks to disallow the cost of rent to the grant on the ground that rent was not a cost item included in the approved budget. However, as discussed above, plaintiff is not bound to the categories of costs proposed in its grant, and no witness testified that rent could not be allocated to the grant in the absence of a rent category in a grant proposal. Plaintiff is bound only by the legal characterization of those costs as direct or indirect costs.

The following rent amounts are thus allocable to the grant, reflecting plaintiff's percentage allocations: $4,025.00 for 1988 at 16% = $604.00; $4,800.00 for 1989 at 65% = $3,220.00; and $4,800.00 for 1990 at 50% = $2,400.00. The remaining amount claimed for indirect costs consists of electricity, phone, shop supplies, indirect labor costs, and indirect fringe costs supported by documentation and not specifically challenged by defendant. By the terms of the grant, plaintiff can recover only $2,000.00 of its indirect costs, and the remaining $23,318.00 may be recouped by the Government.

## SUMMARY OF GRANT PERFORMANCE COSTS

| COST | CLAIMED | ALLOWED | DISALLOWED |
|---|---|---|---|
| Salary | $ 73,977.00 | $ 60,429.00 | $13,548.00 |
| Subcontracts | $ 32,957.00 | $ 32,957.00 | |
| Fringe Benefits | $ 13,615.00 | $ 911.35 | $12,703.65 |
| Travel | $ 1,919.00 | $ 1,919.00 | |
| Equipment | $ 4,414.00 | $ 4,414.00 | |
| Materials | $ 6,429.00 | $ 6,429.00 | |
| Indirect Costs | $ 25,318.00 | $ 2,000.00 | $23,318.00 |
| TOTAL | $158,629.00 | $109,059.35 | $49,569.65 |
| Not Claimed | $ 46,576.00 | | |
| TOTAL GRANT | $205,205.00 | | |

### 6. Post-audit costs

■ According to the General Conditions § 28(b), a grantee who has been informed of any deficiency in performance by the NSF has the right to an opportunity to correct it. Furthermore, although the General Conditions did not adopt the FAR provisions regarding procedures for suspension or termination, as discussed above, they did adopt the FAR provisions regarding the allowability of costs related to such termination.[21] Broadly described, termination costs under FAR

§ 31.205-42 are "costs that would not have arisen had the contract not been terminated." Such costs may include certain organizational costs, such as the cost of common items, initial costs, preparatory costs, loss of useful value of machinery, rent under unexpired leases, alteration of leased property, and claims by subcontractors. *Id.* §§ 31.205-42(a), (c)-(f), (h). Plaintiff presents no claim for costs of this nature, seeking only salary and related indirect costs and certain direct costs paid to outside consultants.

By its terms the General Conditions would seem to make the NSF's determination of the allowability of termination costs conclusive, thus precluding the court's *de novo* review of those costs. Mr. Asrael testified that he made no findings of fact, and defendant does not argue that the court defer to his opinion. Instead, defendant offers various arguments as to why plaintiff's post-audit costs were not reasonable as either audit response or termination costs, and it is those arguments that the court must address.

---

21. General Conditions § 28(c) also states:

No costs incurred during a suspension period or after the effective date of termination will be allowable, except those costs which, in the opinion of the Foundation, the grantee could not reasonably avoid or eliminate, or which were otherwise authorized by the suspension or termination notice, provided such costs would otherwise be allowable under the terms of the grant and the appropriate Federal cost principles.

FAR § 31.205–42(b) does include a catch-all provision allowing recovery for such costs:

> Despite all reasonable efforts by the contractor, costs which cannot be discontinued immediately after the effective date of termination are generally allowable. However, any costs continuing after the effective date of the termination due to the negligent or willful failure of the contractor to discontinue the costs shall be unallowable.

FAR § 31.205–42(g) allows for the recovery of pre- and post-termination costs, properly classified as "settlement expenses," defined as

> (i) [a]ccounting, legal, clerical, and similar costs reasonably necessary for—
>
> (A) The preparation and presentation, including supporting data, of settlement claims to the contracting officer; and
>
> (B) The termination and settlement of subcontracts.
>
> . . . .
>
> (iii) Indirect costs related to salary and wages incurred as settlement expenses in (i) and (ii); normally, such indirect costs shall be limited to payroll taxes, fringe benefits, occupancy costs, and immediate supervision costs.

Plaintiff claims $99,537.00 in "audit response costs" incurred between July 1, 1990, and December 31, 1993, representing $53,787.00 in direct labor, $17,476.00 in other direct costs, and $28,274.00 in indirect costs. The only evidence presented to substantiate these costs was plaintiff's January 13, 1994 letter to Mr. Asrael, which characterized plaintiff's claim for audit response costs according to the following schedule:

| | |
|---|---|
| July 1, 1990 to December 7, 1990 | support of OIG field audit |
| December 7, 1990 to January 14, 1991 | response to OIG draft audit report |
| January 14, 1991 to May 3, 1991 | response to misc. NSF questions |
| May 3, 1991 to August 22, 1991 | response to OIG final audit report |
| August 22, 1991 to March 23, 1993 | negotiation with NSF's Mr. Bruning |
| March 23, 1993 to April 29, 1993 | preparation of appeal of NSF position |
| April 29, 1993 to September 14, 1993 | support of NSF appeal process |
| September 14, 1993 to Dec. 31, 1993 | response to NSF final position |

Exhibit I, identified as a summary of those costs, is attached to the letter. Exhibit I is followed by five schedules of costs. Schedule A, "Direct Labor Costs for Audit Response Activity," summarizes direct labor cost by year. Although note 1 states that "Labor Hours associated with this activity have been separately tracked and recorded as indicated in the time sheets provided in Appendix 1," Appendix 1 is not attached to the letter as admitted into evidence.

Schedule A–1, "Payments to S. Miller for NSF Audit Response Activity," includes direct labor, as well as G & A, bid and proposal, and vacation, holiday, and sick pay costs. Schedule B, "NSF/TIL Audit Response Costs; Other Direct Costs," is a chart with column headings "Exh. No.," "Date," "Payee," "Check Number," and "Costs." The first row listing, for example, states: "1; 01 Nov. 91; J. Glover; 214; $750.00." Ninety-nine exhibits are summarized, none of which is attached to the letter as submitted into evidence. Schedule C, "Indirect Costs by Fiscal Year," is a one-page summary by expense category, for example, "Phone," "Fees & Licenses," and "Health Insurance." Schedule C–1 is a brief "Computation of Overhead Allocation Factors for NSF Audit Response."

No objection was made to the admission of this letter. Indeed, the parties stipulated to its admission along with other documents, most of which were neither discussed with a witness nor argued by counsel.

Left to its own devices, the court would rule that plaintiff's letter to Mr. Asrael is insufficient to support plaintiff's audit resolution and termination costs except insofar as it identifies plaintiff's claim by discrete periods and categories of expenses. Nevertheless, defendant is the master of its argument, and defendant does not challenge plaintiff's submission on these grounds. Defendant concedes that plaintiff has produced evidence that it actually incurred these costs and argues only that they are not allowable under

the FAR or otherwise cannot be supported as reasonable as submitted. The court agrees that, as submitted, the letter to Mr. Asrael does not satisfy plaintiff's burden of proof. The letter does not explain how these costs were reasonably incurred. Nor is the evidence as submitted amenable to a legal determination of why certain types of costs meet the enumerated requirements of substantiation or are of a nature allowable under the FAR, such as whether an attorney was paid on retainer, *see, e.g.,* FAR § 31.205–33(b) (enumerating factors to determine reasonableness of professional and consultant costs), or whether these costs represent the allowable costs of settlement or disallowable costs of a claim against the Government, *see, e.g.,* FAR § 31.205–33(d); *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1543 (Fed.Cir.1996) (explaining circumstances under which a contractor makes a claim against the Government). Indeed, Mr. Asrael testified that he rejected plaintiff's claim as presented in the letter for this very reason. The only testimony presented came from Mr. Miller, who offered that he believed that a $50.00 per hour fee for his post-audit work was "consistent with other work I was doing." This statement fails to illuminate the nature of Mr. Miller's post-audit work. Mr. Miller did not speak to any other post-audit cost items, and neither party asked Mr. Taylor, who Mr. Miller identified as producing the January 1994 letter to Mr. Asrael, any question about the claim as it was presented.

Assuming plaintiff's post-audit costs actually were incurred, plaintiff has made no showing that they were reasonably incurred. The right to recover on this claim has not been established. Because none of the $46,576.00 in unspent funds awarded to plaintiff may be applied to post-termination costs, the Government may recoup this amount.

### 7. *Pre-judgment interest*

■ Defendant asserts that the Debt Collection Act of 1982, 31 U.S.C. § 3717 (1994 & Supp. V 1999), entitles the Government as a matter of right to prejudgment interest on plaintiff's disallowed costs.[22] The Supreme Court has explained that, by virtue of this act, "parties owing debts to the Federal Government must pay prejudgment interest where the underlying claim is a contractual obligation to pay money." *West Virginia v. United States,* 479 U.S. 305, 310, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); *see also Royal Indem. Co. v. United States,* 313 U.S. 289, 295–96, 61 S.Ct. 995, 85 L.Ed. 1361 (1941) ("A suit upon a contractual obligation to pay money at a fixed or ascertainable time is a suit to recover damage for its breach, including both the principal amount and interest by way of damage for delay in payment of the principal, after the due date."). Thus, the mere fact that the Government has secured judgment on a contract does not entitle it to prejudgment interest absent an underlying contractual obligation by the contractor to pay money.

■ Defendant does not explain how the NSF's grant to plaintiff, which has been found to be an implied-in-fact contract, can be construed as a contract in which plaintiff undertook the contractual obligation to pay money of the type which the Supreme Court has held recoverable under the Debt Collection Act. *See West Virginia,* 479 U.S. at 310, 107 S.Ct. 702 (state entered into contractual obligation to pay Government when it accepted disaster relief assistance pursuant to federal statute mandating that costs of such relief be apportioned between recipient state and Government); *Royal Indem.,* 313 U.S. at 295, 61 S.Ct. 995 (surety bond filed with IRS contractually obligated surety to pay money to Government should primary default). Defendant cites to no provision in the General Conditions, the NSF Grant Policy Manual, or the FAR provisions as incorporated into the grant terms, by which plaintiff undertook such an obligation. *Cf. Horizon Coal Corp.*

---

**22.** 31 U.S.C. § 3717(a)(1) (1994 and Supp. V 1999), "Interest and penalty on claims," provides:

The head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12–month period ending on September 30 of each year, rounded to the nearest whole percentage point.

*v. United States,* 43 F.3d 234, 244 (6th Cir. 1994) (district court erred in assessing prejudgment interest under 31 U.S.C. § 3717, when Government could not first establish a "constitutional, contractual, or statutory basis for an award of interest"). The court is not aware of a case where the Debt Collection Act has been awarded following *de novo* review of allowable costs under the FAR. Although the court does have the authority to award prejudgment interest as matter of compensatory damages for breach of contract, *Royal Indem.,* 313 U.S. at 296, 61 S.Ct. 995; *United States v. Texas,* 507 U.S. 529, 534–35, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), defendant's counterclaim does not seek recovery for damages, but, rather, recoupment of disallowed and/or unspent grant funds. Because defendant has not established that the Debt Collection Act entitles it to recover interest on those funds, its claim for interest is denied.

### CONCLUSION

Accordingly, based on the foregoing,

1. Plaintiff has proved by a preponderance of the evidence that it is entitled to retain $109,059.35 in allowable grant performance costs.

2. Plaintiff has failed to prove by a preponderance of the evidence that it is entitled to its claim for $99,537.00 in termination/settlement costs.

3. Defendant has proved by a preponderance of the evidence that it is entitled to recoupment of $96,145.65 in disallowed costs and unspent grant funds.

4. The Clerk of the Court shall enter judgment for defendant in the amount of $96,145.65. No interest shall be assessed.

5. The Clerk of the Court shall also mail a copy of this order to plaintiff, as follows: Thermalon Industries Ltd., c/o Steve Miller, 810 N. Turquoise Drive, Flagstaff, AZ 86001.

**IT IS SO ORDERED.**

No costs.